# CITY OF MINNEAPOLIS v. DEBRA A. BUSCHETTE.

240 N. W. 2d 500.

January 23, 1976—No. 45040.

*C. Paul Jones,* State Public Defender, and *William J. Mauzy,* Assistant State Public Defender, for appellant.

*Walter J. Duffy, Jr.,* City Attorney, *J. David Abramson* and *John P. Fitzgerald, Jr.,* Assistant City Attorneys, and *Dennis L. Peterson,* Student Intern, for respondent.

*Olkon & Olkon* and *Nancy K. Olkon,* amicus curiae, seeking reversal.

Heard before Sheran, C.J., and Otis, Rogosheske, Peterson, Kelly, MacLaughlin, Yetka, Scott, and Chanak, JJ., and considered and decided by the court en banc.

KELLY, JUSTICE.

Defendant appeals from her conviction of prostitution in Hennepin County Municipal Court after denial of her motion to dismiss the charge because of alleged discriminatory enforcement of the Minneapolis prostitution ordinance.[1] We affirm.

Defendant, Debra A. Buschette, was arrested by a Minneapolis plainclothes police officer on September 14, 1973, and charged with violating Minneapolis Code of Ordinances, § 870.110, which provides:

---

[1] At the outset, we take note that prior to oral argument the city of Minneapolis filed a motion to dismiss this appeal, claiming that an appeal directly from municipal court to the supreme court was improper. This motion was denied with the right to raise it again at oral argument. The city again raised this jurisdictional question, and we deny the motion. At the time this appeal was taken, a direct appeal was clearly authorized by Minn. St. 488A.01, subd. 11, which provides: "All causes civil and criminal shall be removed from the municipal court to the supreme court of the state of Minnesota in the same manner, upon like proceedings and with like effect as from district courts."

See, also, Rule 28.09, Rules of Criminal Procedure, which provides that all appeals from county courts, including municipal courts, shall be to the district court. This supersedes Minn. St. 488A.01, subd. 11, by eliminating the direct appeal to this court after July 1, 1975, the effective date of these rules.

"No person, in any public or private place, shall offer or submit his or her body indiscriminately for sexual intercourse, whether or not for a consideration."

At trial to the court on October 26, 1973, defendant contended that the Minneapolis morals squad was discriminating against female prostitutes, in violation of the equal protection clause of the State and Federal Constitutions, by not also arresting male customers.

The court heard evidence on the issue, consisting mainly of the stipulated testimony of the then chief of the morals squad given in a previous case and the testimony of another officer on the morals squad. This testimony can be summarized as follows:

A. Minneapolis Code of Ordinances, § 870.110, under which defendant is charged, applies equally to men and to women;

B. All nine permanent members of the Minneapolis morals squad are men;

C. An important function of the morals squad, as articulated by its then chief officer, Sergeant Jon Prentice, is to eliminate or control prostitution on the streets of the city;

D. In the performance of this important duty, the morals squad officer makes himself available for propositions by suspicious women by acting in the role of decoy or, in the argot of the profession, as the "trick";

E. One hundred ninety adults were charged with prostitution between March 31, 1972, and August 28, 1973, of whom 172 were women and 18, men;

F. On only one occasion, in March 1972, a policewoman was used by the morals squad as a decoy, and she effected the arrest of 7 of the above 18 men for the offense of prostitution;

G. Of the remaining 11 men, most, if not all, were female impersonators;

H. Since August 28, 1973, and until October 26, 1973, 29 persons were arrested by the morals squad and charged with prostitution, 17 of them being female and 12 of them being male;

I.   Of the 12 males arrested by morals squad officers, none of them was arrested for offering to take money from a female to perform an act of sexual intercourse with her, but all were arrested after they attempted to solicit a female police officer by offering her money to do so with them;

J.   Of the 12 males arrested between August 28, 1973, and October 26, 1973, none of them was a female impersonator;

K.   Of the 12 males arrested between August 28 and October 26, 1973, most were arrested following defendant's arrest on September 14, 1973;

L.   It is the current intention of the morals squad to continue apprehension of males as well as females who are engaged in prostitution.

The one central issue that is dispositive of this appeal is: Was there a discriminatory enforcement of Minneapolis Code of Ordinances, § 870.110, contrary to the equal protection clauses of the State and Federal Constitutions?

For the purpose of better focusing on this issue, we point out that the ordinance involved in this case applies to both men and women, and that it is not contended that it is facially unconstitutional under State and Federal equal protection clauses.[2]

The thrust of defendant's claim is that, while the ordinance applies to both men and women, this neutral provision is selec-

---

[2] While we do not intimate agreement or disagreement with their holdings, we are aware of at least two cases in other jurisdictions which have held that prostitution statutes which apply only to women are not violative of the constitutional equal protection clauses. State v. Mertes, 60 Wis. 2d 414, 210 N. W. 2d 741 (1973); and State v. Devall, 302 So. 2d 909 (La. 1974). See, also, Wilson v. State, 258 Ind. 3, 278 N. E. 2d 569 (1972). It may be argued that if such statutes are constitutionally valid, even though they legislatively mandate a selective enforcement policy, then an enforcement policy aimed primarily, though not exclusively, at female prostitutes rather than male customers is likewise constitutionally permissible so long as the selectivity is based on a classification that is rationally related to proper law-enforcement purposes.

tively enforced only against women. There can be no doubt that the equal protection clause of the Fourteenth Amendment forbids the discriminatory enforcement of nondiscriminatory laws. Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. ed. 220 (1886) involved a conviction under a regulatory ordinance that made it a misdeameanor to maintain a laundry without first obtaining the consent of the municipal board of supervisors. In overturning the conviction, the United States Supreme Court did not find the ordinance to be void on its face. However, it found the vice to be the practice of denying permits to persons of Chinese ancestry while granting permits to white persons:

"* * * Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." 118 U. S. 373, 6 S. Ct. 1073, 30 L. ed. 227.

In the decades following Yick Wo, the courts seemed to limit the holding to cases involving regulatory ordinances with penal sanctions, such as Sunday closing laws. People v. Utica Daw's Drug Co. 16 App. Div. 2d 12, 225 N. Y. S. 2d 128 (1962); Mangold Midwest Co. v. Village of Richfield, 274 Minn. 347, 143 N. W. 2d 813 (1966). However, in recent years courts have been abandoning the distinction between regulatory and penal laws. The trend is toward a rule allowing the defense of discriminatory enforcement to be raised in a variety of criminal cases. United States v. Steele, 461 F. 2d 1148 (9 Cir. 1972); United States v. Swanson, 509 F. 2d 1205 (8 Cir. 1975); United States v. Berrios, 501 F. 2d 1207 (2 Cir. 1974); United States v. Berrigan, 482 F. 2d 171 (3 Cir. 1973); United States v. Falk, 479 F. 2d 616 (7 Cir. 1973); United States v. Crowthers, 456 F. 2d 1074 (4 Cir.

1972) ; People v. Harris, 182 Cal. App. 2d Supp. 837, 5 Cal. Rptr. 852 (1960).[3]

In Minnesota, this court has found occasion to speak to the issue. In State v. Vadnais, 295 Minn. 17, 202 N. W. 2d 657 (1972), we found unequal enforcement of a regulatory ordinance dealing with mobile trailer homes. However, the opinion did not limit itself to solely regulatory laws, but suggested the defense would be available to various types of minor offenses:

"* * * However, we are satisfied that in this type of case, which involves what may be legally characterized as a petty offense—one not intrinsically harmful—, a defendant should be permitted to raise the defense at trial and, upon adequate proof of intentional discrimination, be granted the relief of dismissal." 295 Minn. 21, 202 N. W. 2d 660.

This notion that the defense of selective enforcement is not limited to regulatory provisions was further expanded by our decision in State v. Sharich, 297 Minn. 19, 209 N. W. 2d 907 (1973). The defendant there, as here, claimed discriminatory enforcement of the prostitution ordinance, but on the basis of race and economic self-interest of selected bar owners. Although the opinion did not decide whether discriminatory enforcement had in fact occurred, no definite distinctions were drawn based upon the nature of the conduct. We remanded the case to—

"* * * permit the defendant to offer evidence to support her claim of discriminatory penal enforcement at the law-enforcement level. The defendant should be permitted to offer such evidence at a pretrial hearing with witnesses subpoenaed, if need be, and without the prior requirement of affidavits from prospective witnesses, who defendant claims are identified with that alleged state discriminatory conduct; cross-examination of hos-

---

[3] See, also, Comment, 61 Col. L. Rev. 1103; Tieger, *Police Discretion and Discriminatory Enforcement,* 1971 Duke L. J. 717; Givelber, *The Application of Equal Protection Principles to Selective Enforcement of the Criminal Law,* 1973 U. of Ill. Law Forum 88.

tile witnesses may well be necessary if the trial court so determines." 297 Minn. 26, 209 N. W. 2d 913.

This language setting out a procedure was intended to apply to charges other than common prostitution. We now take Sharich one step further by holding that the defense of discriminatory enforcement by law-enforcement officials on all levels of state criminal laws and municipal penal ordinances may be raised by a defendant. Hereafter, this defense should be raised prior to trial by motion pursuant to the Minnesota Rules of Criminal Procedure,[4] or it may be deemed waived. Since the issue of discriminatory enforcement does not go to the guilt or innocence of the particular defendant, the matter should be heard and decided by the court prior to trial, as with other constitutional challenges. The defense has the burden of producing evidence of discrimination by a clear preponderance of the evidence.[5] If such intentional and purposeful discriminatory enforcement is shown, the court has the remedy of dismissing the charge against the defendant.

While dismissal may be an extreme remedy, especially when the guilt of certain defendants may seem clear, it is only by this means that the courts will put an end to the arrest and prosecution of persons based on intentional and purposeful discrimination. (See the excerpt from United States v. Swanson, 509 F. 2d 1208 [8 Cir. 1975], quoting United States v. Berrios, 501 F. 2d 1207 [2 Cir. 1974], set forth in footnote 8, *infra.*)

The defendant attempted to establish a pattern of discriminatory enforcement against women, first, by her claim that the policies and methods used by the Minneapolis police morals squad in enforcing the prostitution ordinance were questionable. However, defendant was not able to bring forth any proof of a police

[4] See Rules 10.04, subd. 1; 11.03; 11.04; 12.02; 12.03; and 17.06, subd. 2, Rules of Criminal Procedure.

[5] People v. Utica Daw's Drug Co. 16 App. Div. 2d 12, 18, 225 N. Y. S. 2d 128, 134; People v. Gray, 254 Cal. App. 2d 256, 63 Cal. Rptr. 211 (1967); United States v. Swanson, 509 F. 2d 1205 (8 Cir. 1975).

policy to arrest only female prostitutes. On the contrary, the stipulated testimony of the chief of the morals squad specifically indicated that it was their intent to arrest both men and women. Officer Robert Berneck also testified that both customers and prostitutes, male and female, could be arrested under the ordinance. We give great weight to this testimony as it indicates to us the defendant failed in carrying her burden of affirmatively showing intentional and purposeful discrimination against one person or a class of people.[6] Without the element of conscious intent on the part of law-enforcement officials, the case is distinguishable from situations cited to us by defendant where a deliberate policy of discrimination was either readily apparent or admitted.[7]

Regarding the methods used by the police, defendant claims the all-male composition of the morals squad acting as plainclothes decoys or "tricks" is per se discriminatory. We do not agree with defendant that the practice of having these officers present in areas known to be solicited by female prostitutes, in and of itself, can be called discriminatory enforcement, though it may result in selective enforcement.

Defendant's second method of attempting to establish discriminatory enforcement was by comparative statistics of the number of arrests made of men and the number made of women. We disagree with defendant that these statistics alone are proof positive of discriminatory enforcement. Comparing the number of arrests of women with that of men is proof only that there was selective enforcement. It follows that this enforcement policy resulted in a similar disparity in prosecutions. In fact, the state concedes in this case that the enforcement of the prosti-

---

[6] Snowden v. Hughes, 321 U. S. 1, 64 S. Ct. 397, 88 L. ed. 497 (1944); State v. Vadnais, 295 Minn. 17, 202 N. W. 2d 657 (1972); See, also, Comment, 53 Boston U. L. Rev. 1038, 1044.

[7] State v. Vadnais, *supra;* United States v. Wilson, 15 Cr. L. Rptr. 2001 (D. C. Super. Ct. 1974); United States v. Moses, 41 U. S. L. W. 2298 (D. C. Super. Ct. 1972).

tution ordinance has been selective but contends it nonetheless is not discriminatory and is constitutionally valid. In order to be a violation of the equal protection clause, entitling a defendant to a dismissal of the charge, the arrest must have been based upon an unjustifiable standard such as race, religion, national origin, or other arbitrary classification. Oyler v. Boles, 368 U. S. 448, 82 S. Ct. 501, 7 L. ed. 2d 446 (1962). Thus far, as a matter of constitutional interpretation, discrimination based upon sex, whether it be a matter of legislative classification or police conduct, has not been declared a matter for strict scrutiny, where the state or local authority must show a compelling interest in employing the classification. In Frontiero v. Richardson, 411 U. S. 677, 93 S. Ct. 1764, 36 L. ed. 2d 583 (1973), the court struck down a Federal uniformed services benefit scheme that impermissibly assumed that female spouses of servicemen would normally be dependent upon their husbands, while male spouses of servicewomen would not. As our analysis of the valid and neutral governmental purpose underlying any selectivity on the instant case has demonstrated, no such impermissible and overbroad assumptions are made here. While four members of the court in Frontiero favored strict scrutiny of sex-based classifications, we note that one member of that plurality, Mr. Justice Douglas, has now left the court, and that the strict scrutiny advocates have been unable to attract a majority to their view in the two years since Frontiero. See, Kahn v. Shevin, 416 U. S. 351, 94 S. Ct. 1734, 40 L. ed. 2d 189 (1974); Schlesinger v. Ballard, 419 U. S. 498, 95 S. Ct. 572, 42 L. ed. 2d 610 (1975). The current standard, therefore, remains authoritatively expressed by Chief Justice Burger in Reed v. Reed, 404 U. S. 71, 76, 92 S. Ct. 251, 254, 30 L. ed. 2d 225, 229 (1971):

"* * * A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster*

*Guano Go. v. Virginia*, 253 U. S. 412, 415 [40 S. Ct. 560, 64 L. ed. 989] (1920)."

Thus stated, the standard was used in Reed to invalidate an Idaho statute giving a mandatory preference to males for appointments as administrators of estates of persons dying intestate. Rejecting the proffered objective of reducing the probate court workload by eliminating one class of contests, the court further observed that men and women were similarly situated with respect to various classes of persons entitled to appointment as administrators. Thus we conclude that all that need be shown is a rational basis for the selectivity, as set forth in Reed v. Reed, *supra*. In this case, then, some rational relationship between the city's objective of controlling prostitution and the practice of arresting chiefly women violators will defeat a claim based on the equal protection clause.

The state here contends:

"* * * Law enforcement authorities in Minneapolis have concluded that, in light of current resources, a concentration on the sellers of sexual services, rather than on the buyers, is more efficient and thus is more likely to achieve the end sought by *Minneapolis Ordinance* § 870.110. It is quite clear that, in many instances, the arrest of one seller will prevent more occurrences of the behavior proscribed by the ordinance in question than the arrest of a number of buyers. This is true, for example, in enforcement policies which focus on the sellers of drugs, rather than buyers, and is manifestly true in a prostitution situation in which a single seller may service a number of customers in a short period of time."

We are aware of the problems encountered in other jurisdictions by police departments that used female police officers as decoys. In United States v. Wilson, 342 A. 2d 27 (D. C. Ct. App. 1975), the District of Columbia Court of Appeals held that selectivity in law enforcement is impermissible only if designated to discriminate against those prosecuted rather than as a part of

a rational pattern of general enforcement. That court recognized the problem police had in using female police officers as decoys as follows:

"The *modus operandi* of his officers is to walk in the area where prostitutes are believed to be as if they were prospective customers, 'the prostitute will normally, as he's [the officer] walking by, say, "hi, are you sporting", and the conversation will go from there';

"The Department on occasion has placed female police officers on the street to pose as prostitutes and, thereafter, males looking for prostitutes were arrested on the charge of soliciting for prostitution; but, the cases 'were all dismissed because [of] the entrapment aspect. And we have never had a conviction of a male subject for soliciting a policewoman that I know of', because 'the girl usually does the approaching and if the policewoman says hi, are you sporting, that's entrapment' * * * ." 342 A. 2d 29.

That court expressed no views on the right to the use of the defense of entrapment under such circumstances, nor do we. Mr. Chief Judge Reilly in a concurring opinion pointed out:

"Plainly, it is outside the province of a trial court to direct a police department, whose manpower is already severely strained in coping with the increase in such major felonies as murder, robbery, rape, and other assaults, how best to utilize its personnel in the enforcement of a relatively minor misdemeanor statute. As this court is satisfied that the record does not support any finding of sexual discrimination, I concur in the judgment of reversal." 342 A. 2d 32.

We conclude that defendant has not met the heavy burden of proving that the state's selection of her for prosecution has been invidious or in bad faith, i. e., based upon some impermissible consideration. Nor can it be said that there has been "intentional and purposeful" discrimination. There has been a conscious selectivity in enforcement of the prostitution ordinance; however,

there is a rational relationship between that selectivity and the governmental objective of controlling prostitution.[8]

Affirmed.

[8] In Kahn v. Shevin, 416 U. S. 351, 94 S. Ct. 1734, 40 L. ed. 2d 189 (1974), Mr. Justice Douglas used a "rational basis" analysis in examining a statute's classification granting property tax exemption for widows and concluded that its differing treatment of males and females rested " 'upon some ground of difference having a fair and substantial relation to the object of the legislation.' " 416 U. S. 355, 94 S. Ct. 1737, 40 L. ed. 2d 193.

In the case of United States v. Swanson, 509 F. 2d 1205, 1208 (1975), the Court of Appeals for the Eighth Circuit stated: "It is well established that a reasonable prosecutorial discretion is inherent in our judicial system, United States v. Wiley, 503 F. 2d 106, 107 (8th Cir. 1974) * * *."

The principles enunciated in Swanson are applicable to the issue in the instant case. In Swanson the defendants sought reversal of conviction of tax crimes by reason of the selective enforcement of criminal tax laws. The evidence on this issue disclosed that the Internal Revenue Service gave "special priorities" to the prosecution of tax crimes by attorneys, certified public accounts, and enrolled practitioners. The defendants, as members of such a class, claimed that this focusing on professionals was an unconstitutional discrimination. The court observed (509 F. 2d 1208, note 6): "Because federal governmental action rather than state action is challenged here, appellants' argument must be framed in terms of the Fifth Amendment. While only the Fourteenth Amendment, which is addressed to the states, contains an equal protection clause, the Fifth Amendment, which limits action by the federal government, does contain a due process clause. The Supreme Court has observed that 'the concepts of equal protection and due process * * * are not mutually exclusive' and that 'discrimination may be so unjustifiable as to be violative of due process.' Bolling v. Sharpe, 347 U. S. 497, 499, 74 S. Ct. 693, 694, 98 L. Ed. 884 (1954)."

In sustaining the conviction in Swanson, the court quoted favorably (509 F. 2d 1208) from an opinion of the Court of Appeals for the Second Circuit, United States v. Berrios, 501 F. 2d 1207, 1211 (2 Cir. 1974): "To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie,* (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge

against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as *'intentional and purposeful discrimination.'* See, Snowden v. Hughes, 321 U. S. 1, 8, 64 S̈. Ct. 397, 88 L. Ed. 497 (1943); Moss v. Hornig, 314 F. 2d 89, 92-93 (2d Cir. 1963); United States v. Ahmad, 347 F. Supp. 912 (M. D. Pa. 1972), aff'd sub nom., United States v. Berrigan, 482 F. 2d 171 (3rd Cir. 1973); United States v. Falk, 479 F. 2d 616 (7th Cir. 1973) (en banc); United States v. Crowthers, 456 F. 2d 1074 (4th Cir. 1972); United States v. Steele, 461 F. 2d 1148 (9th Cir. 1972). See, Comment, 'The Right to Nondiscriminatory Enforcement of State Penal Laws,' 61 Colum. L. Rev. 1103 (1961). Mere 'conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation.' Oyler v. Boles, 368 U. S. 448, 456, 82 S. Ct. 501, 506, 7 L. Ed. 2d 446 (1962)." (Italics supplied in part.)