STATE of Minnesota, Respondent,

v.

Tommy E. RUSSELL, Appellant.

No. C6–82–1111.

Supreme Court of Minnesota.

Jan. 27, 1984.

---

William R. Kennedy, Hennepin County Public Defender, Franklin J. Knoll, Ellen Baudler, Peter Cahill, Asst. Public Defenders, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Minneapolis, for respondent.

WAHL, Justice.

Defendant, who is black, was arrested and charged with theft in violation of Minn. Stat. §§ 609.52, subds. 1, 2(1), 3(2), and 609.05 (1982). The charge was based on evidence that defendant participated in the sale of stolen goods on January 28, 1982, to a black undercover officer who was running a so-called "sting operation" out of a Bloomington townhouse. Defendant and a number of other defendants whose charges also arose out of the sting operation moved to dismiss before trial on the ground of racially discriminatory enforcement of the law. A district court judge denied this motion. Thereafter, a district court jury found defendant guilty as charged. The trial court sentenced defendant to a 13-month prison term but stayed execution of the sentence on condition that defendant serve 6 months of probationary jail time. The court stayed that jail time pending this appeal. The appeal does not challenge the sufficiency of the evidence to convict but contends that defendant's conviction should be vacated because the district court erred in denying the pretrial motion to dismiss. We affirm.

The claim in this case is that the state violated the equal protection clause of the federal constitution in selecting defendant and other black defendants for prosecution. The United States Supreme Court has long held that when the law is administered in a discriminatory fashion, the defendant is entitled to a dismissal of the charges. *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). In *City of Minneapolis v. Buschette*, 307 Minn. 60, 66, 240 N.W.2d 500, 503 (1976), this court's leading case on discriminatory enforcement, we held that the defense of discriminatory enforcement by law enforcement officials applies, not only to a charge of common prostitution, as in that case, but on all levels of state criminal laws and municipal penal ordinances.

In *Buschette* we followed the test for discriminatory enforcement that most courts, including the Eighth Circuit,[1] follow, a test that was summarized in *United States v. Berrios*, 501 F.2d 1207, 1211 (2nd Cir.1974), thus:

> To support a defense of selective discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional right.

Under this test, a defendant claiming racially discriminatory enforcement must establish a *prima facie* case of racially discriminatory impact and discriminatory intent, purpose or motive in order to trigger strict scrutiny. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); Gifford, *Equal Protection and the*

---

1. *See United States v. Swanson*, 509 F.2d 1205 (8th Cir.1975).

*Prosecutor's Charging Decision,* 49 Geo. Wash.L.Rev. 659, 689–91 (1981). The burden of a defendant is proof by a clear preponderance of the evidence. 240 N.W.2d 503.

 The evidence at the pretrial hearing in this case established that the Third Precinct of the Minneapolis Police Department had more residential burglaries than any other precinct and that three response zones within the precinct—predominantly black neighborhoods—accounted for 60 percent of the precinct's burglaries. The decision to address this problem was a neutral one, based on crime statistics, and could only benefit the law-abiding residents of the neighborhoods who had to contend with the high burglary rates. Acting together, the Minneapolis Police Department and the Bureau of Criminal Apprehension began an undercover operation in which two white officers began making street buys of stolen property. These officers achieved only limited success. Subsequently, a black agent of the BCA who had extensive experience as an undercover officer, including experience in predominantly white communities in Minnesota, began making street buys in the neighborhoods in question. Later, to better insure his safety and to facilitate the development of evidence needed for prosecution, the agent was set up in a townhouse in Bloomington, a location chosen because it was convenient to his residence. At the agent's request, a female police officer was assigned to pose as his girlfriend and to act as a security officer. The officer chosen was white and from a suburban police department, an officer with whom some of the officers in the operation had worked before. The black agent then told the contacts that he had made that henceforth they would have to bring their goods to his house in Bloomington.

The defendant, claiming racially discriminatory enforcement, had the burden of establishing a *prima facie* case of discriminatory impact and discriminatory intent, purpose or motive. We agree with the district court that he failed to meet that burden in this case. In this connection, it is true that a large percentage of the people who brought goods to the townhouse to sell were blacks and that of the 43 who were identified and prosecuted only one was white. However, those facts, either alone or in combination with the other facts, do not establish a *prima facie* case of discriminatory impact and discriminatory intent. Rather, it appears that the police were conducting a neutral undercover operation in predominantly black neighborhoods that were plagued by a high residential burglary rate and that their sole purpose was to identify and prosecute as many of the offenders as possible. The fact that most of the offenders in predominantly black neighborhoods were black does not establish purposeful discrimination any more than the fact that most of the offenders were white would establish purposeful discrimination in an undercover operation in a predominantly white neighborhood having a similar high residential burglary rate.

Affirmed.