**STATE of Minnesota, Respondent,**

v.

**Leonard Russell WOODARD, Appellant.**

**No. CO–85–521.**

Court of Appeals of Minnesota.

Nov. 26, 1985.

Review Denied Jan. 23, 1986.

Hubert H. Humphrey, III, State Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin Co. Atty., Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

William R. Kennedy, Hennepin County Public Defender, Richard A. Trachy, Minneapolis, for appellant.

Heard, considered and decided by SEDG-WICK, P.J., and LESLIE and NIEREN-GARTEN, JJ.

### OPINION

SEDGWICK, Judge.

Leonard Woodard appeals his conviction of theft under Minn.Stat. § 609.52, subd. 2(1), subd. 3(3)(a) (1984). He also appeals the trial court's pre-trial order denying his motion to dismiss for discriminatory enforcement. We affirm.

### FACTS

On May 27, 1984 at about 1:00 a.m., appellant was driving with his girlfriend

northerly along Seventh Street from downtown Minneapolis. He stopped in front of a vehicle that was parked on Seventh Street, north of Oak Lake Avenue North. The person in the driver's seat was slumped over and appeared to be unconscious or drunk.

The person in the parked car was actually a Minneapolis police officer, acting as a part of an operation conducted by the Decoy Unit of the Street Division. He had driven partially onto the sidewalk, and the driver's door was partially open. The officer also had in his left pants pocket a wallet which contained several credit cards and $24 in marked currency.

Another officer was stationed across the street in a parking lot as a lookout, about 75–100 feet away from the decoy's car. According to the lookout officer, appellant made several trips back and forth to the decoy's car. He went over to the car, reached inside it, then returned to his car and said something to the passenger. He went again to the decoy's car and started touching the officer and feeling his clothes. The observing officer saw appellant reach into the pockets of the decoy officer and then return to his car and get inside. He returned another time to the decoy's car, turned off the parking lights and turned on the four-way flashers. Then appellant returned to his car and drove away.

The decoy officer, who had his eyes closed during the entire operation, also testified. While "in role," he heard footsteps and felt his wallet slowly being removed from his rear pants pocket. A short time later he heard the party return and place the wallet on his thigh. At this time, the decoy officer gave a prearranged signal to the observing officer that a theft had occurred. Then the party returned and removed the wallet from his thigh, but a short time later returned and put the wallet in his jacket pocket. After the decoy officer heard a vehicle leave, he checked to see if anything had been taken from the wallet and found that currency and one credit card had been taken.

After appellant drove away, he was pursued and stopped without incident by other officers. The marked $24 was alongside the passenger seat, and a single credit card had dropped by the driver's seat. Appellant remarked to the arresting officers, seeing his girlfriend was also being arrested, "Why are you arresting the both of us when I did it?" When asked if his girlfriend had placed the money on the passenger side, he replied, "Well, she didn't do it."

## ISSUES

1. Did the trial court err in ruling that the decoy operation did not discriminate on the basis of race?

2. Does the evidence support the verdict?

## ANALYSIS

■ 1. Two major Minnesota cases discuss the defense of discriminatory enforcement: *State v. Russell*, 343 N.W.2d 36 (Minn.1984); and *City of Minneapolis v. Buschette*, 307 Minn. 60, 240 N.W.2d 500 (1976).

In *Russell*, the supreme court outlined the test to be used to determine whether enforcement has been discriminatory:

> To support a defense of selective discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.*, based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional right.

*Russell*, 343 N.W.2d at 37 (*citing United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974)).

These two elements are sometimes referred to as "intentional and purposeful discrimination." *Buschette*, 307 Minn. at

71–72, 240 N.W.2d at 506, n. 8 (citations omitted). In *Buschette* the supreme court held that a policy of using an all male morals squad for the decoy unit was not discriminatory enforcement of prostitution laws. *See also State v. L'Italien*, 363 N.W.2d 490 (Minn.Ct.App.1985), *pet. for rev. denied* (Minn. April 26, 1985).

Defendant must prove this prima facie case by a clear preponderance of the evidence. *Russell*, 343 N.W.2d at 38 (citations omitted).

In his motion to dismiss based upon discriminatory enforcement, appellant claimed that the decoy operation had a disparate impact on racial minorities. He cited the following statistics:

Racial minorities constitute 12.7% of the population of the city of Minneapolis (and only 6.5% of Hennepin County's population). Yet in 1983, of 88 felony SCDU complaints, 82 (93%) were against persons of minority races.

\*     \*     \*     \*     \*     \*

The majority of persons arrested for crimes in Minneapolis are white. In 1983, 11,080 (59.4%) adult whites were apprehended for all crimes as opposed to 7,553 (40.6%) adult minorities. Likewise, a compilation of property crime categories including larceny, burglary and stolen property shows that in 1983, 1,752 (52.6%) adult whites were arrested and only 1,576 (47.4%) adult minorities. Yet the percentage of felony charges against minorities in SCDU operations in 1983 far exceeded this percentage, being 93% minority \* \* \*.

Appellant also argued that the police department's intent was discriminatory, since the police knew the effect of the decoy unit and yet continued its operations unchanged.

The trial court found that although the evidence showed the arrests involved a large percentage of minority persons, appellant failed to establish a prima facie case of discriminatory impact.

The trial court explained that although evidence disclosed that 85 to 90 percent of those arrested from the decoy operation were minority persons, in the last three months, street robbery reports indicated that minority persons comprised 82 percent of the crime perpetrators.

The trial court also stated that there was insufficient evidence of discriminatory intent. The court said the proper analysis for intent included scrutiny of the facts and circumstances surrounding the operation of the decoy unit. The evidence established that the unit was patterned after similar units used to combat street crime in New York City and Chicago. In its order denying appellant's motion to dismiss, the trial court stated:

The location of the activities of the unit were determined almost exclusively by two different criteria. First, daily crime statistics reports regarding street robberies were examined to determine the current location of the concentration of street robberies and thefts from person. The actual decoy operation was located in the same general area as the actual reports of crime and customarily within a block of the actual location of the street crimes disclosed in the current reports. The only exception to the location of the decoy operation in the area of current crime was pursuant to the request of citizens or citizen groups who had complained of a serious problem \* \* \*.

The trial court added that appellant failed to demonstrate any selectivity in the prosecution of those arrested or any discrepancy in severity of the charges made against those apprehended as a result of the decoy operations.

This case is similar to *Russell*, which was also an undercover operation in Minneapolis. The court in *Russell* said the burden of establishing a prima facie case had not been met:

[I]t is true that a large percentage of the people who brought goods to the townhouse to sell were blacks and that of the 43 who were identified and prosecuted only one was white. However, those facts, either alone or in combination with the other facts, do not establish a *prima*

*facie* case of discriminatory impact and discriminatory intent. Rather, it appears that the police were conducting a neutral undercover operation in predominantly black neighborhoods that were plagued by a high residential burglary rate and that their sole purpose was to identify and prosecute as many of the offenders as possible. The fact that most of the offenders in predominantly black neighborhoods were black does not establish purposeful discrimination any more than the fact that most of the offenders were white would establish purposeful discrimination in an undercover operation in a predominantly white neighborhood having a similar high residential burglary rate.

*Id.* at 38.

Likewise, appellant here did not meet the burden of proving discriminatory intent. The cited statistics do show most of the persons arrested by the decoy unit were black. However, the decoy operations were located in various parts of the city because of crime statistic reports which showed certain neighborhoods had high theft rates. Moreover, the police testified that decoy operations had been placed in almost every precinct in Minneapolis. Therefore, the trial court properly ruled that appellant failed to meet his burden of proof.

■ 2. Appellant next argues that the property was taken with the consent of the officer, since the purpose of the decoy unit is to see if anyone will steal certain items. According to Minn.Stat. § 609.52, subd. 2(1), theft is committed when one:

> Intentionally and without claim of right takes, uses, transfers, conceals or retains possession of movable property of another without his consent and with intent to deprive the owner permanently of possession of the property.

This argument is not well founded. The officer in the "decoy" role on the night appellant was arrested testified that he did not consent to the taking of the money or credit card. This testimony was not controverted.

■ Appellant argues he cannot be convicted of theft because the evidence did not prove criminal intent existed when the property was taken from the decoy. The theft statute requires that one take, use, transfer, conceal or retain the property with intent to deprive the owner of possession permanently. The evidence showed that although appellant went back and forth from his car to the decoy's car, he finally drove away, retaining the money. The jury could have drawn the reasonable inference either that he took with criminal intent or that he intended to permanently retain the money.

### DECISION

We affirm the decision of the trial court.