VIRGINIA ANCHOND SALAISCOOPER, Petitioner, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, in and for THE COUNTY OF CLARK and THE HONORABLE JOSEPH T. BONAVENTURE, District Judge, Respondents, and THE STATE OF NEVADA, Real Party in Interest.

No. 38296

November 15, 2001            34 P.3d 509

*William B. Terry,* Las Vegas, for Petitioner.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Real Party in Interest.

# OPINION

*Per Curiam:*

## INTRODUCTION

Petitioner Virginia Anchond Salaiscooper contends that, in prosecuting her for solicitation of prostitution, Clark County District Attorney Stewart Bell is engaging in impermissible unconstitutional selective prosecution that violates her right to equal protection under the law. More specifically, Salaiscooper contends that the district attorney intended to discriminate against females by implementing a policy that prohibited his deputies from entering into plea negotiations with female defendants charged with solicitation of prostitution, thereby foreclosing any possibility that they could attend a diversion class in order to avoid solicitation convictions.

Had the district attorney done as Salaiscooper alleges and, in exercising his prosecutorial discretion, intended to discriminate against women, we would agree with Salaiscooper. However, the unrefuted evidence in this matter demonstrates that the district attorney's prosecution policy differentiates between buyers of sex

and sellers of sex, not between males and females. We cannot say that a prosecutor intends to discriminate against females by allowing all buyers of sex, regardless of gender, to attend a successful diversion program, which is designed solely for buyers of sex. We also cannot say that a prosecutor intends to discriminate against females by implementing a policy treating sellers of sex differently in order to deter acts of prostitution committed by those who work in the adult entertainment industry. Because we conclude that this is a case of prosecutorial discretion and not unconstitutional selective prosecution, we deny Salaiscooper's petition.

## FACTS

This matter has a somewhat unusual procedural history. On February 29, 2000, Megan Joy Hayhurst, who was charged with soliciting prostitution, filed a motion for discovery requesting the written policy of the Clark County District Attorney's Office concerning prosecution of solicitation of prostitution cases. Hayhurst contended that the policy violated the Equal Protection Clauses of the United States and Nevada Constitutions because it resulted in impermissible gender discrimination.[1] Hayhurst was represented by attorney William B. Terry, who was also counsel of record for numerous other defendants charged with solicitation of prostitution in the various departments of the Las Vegas Justice Court, wherein the same argument was raised.

The policy at issue was summarized in a December 1999 memo from Clark County District Attorney Stewart Bell to his deputies. The memo provided:

> In light of some changes in policy at the Las Vegas Metropolitan Police Department with regard to work card licensing for exotic dancers charged with prostitution, it has been agreed . . . that *(except in cases of first time male offenders who opt for the diversion program)* we will not negotiate the nature of cases of soliciting prostitution, nor will we agree that they may be in the future dismissed for any reason.

The policy was implemented due to the American Civil Liberties Union's (ACLU) objection to the fact that the Las Vegas Metropolitan Police Department (Metro) was revoking adult entertainment industry employees' work cards based merely on an arrest for solicitation of prostitution. The ACLU contended that revoking a work card needed to work in the entertainment industry without an underlying conviction violated due process. In response to the ACLU's objection, the district attorney imple-

---

[1]*See* U.S. Const. amend. XIV, § 1; Nev. Const. art. 4, § 21.

mented a no-plea-bargain policy that prohibited his deputies from entering into a plea agreement with a defendant charged with solicitation of prostitution allowing a plea to a lesser charge. The plain language of the policy prohibiting plea bargains excepted first time male defendants.

Because the justice court was concerned with the gender-specific language used in the policy, it ordered an evidentiary hearing where both sides could present evidence to support or refute a specific finding of discriminatory purpose. As a result of the court's order, Mr. Terry and the State agreed that they would randomly select a solicitation of prostitution case in which to conduct the hearing out of the fifty-six pending in the various departments of the Las Vegas Justice Court. The Salaiscooper case was randomly selected, and Justice of the Peace Jennifer Togliatti presided over the hearing.

The State called two witnesses to testify at the hearing. The first witness was Dr. Roxanne Clark Murphy, a clinical psychologist and the Program Coordinator for the First Offender Program for Men in Las Vegas. Murphy testified that she developed the First Offender Program in collaboration with Metro and that it boasted an extremely low recidivism rate of less than one percent. Murphy explained that the diversionary program was designed for buyers of sex that are statistically almost always male. Murphy also described the requisite for entrance into the program was that a defendant must be a first-time offender charged with soliciting a prostitute.

Murphy testified that the vast majority of sellers of sex are females. Murphy also stated that it would take a minimum of a year to successfully rehabilitate a seller of sex. Murphy explained that, in order for a diversion program to be an effective deterrent, it would need to be a residential program that would protect women from their pimps, teach them job skills, and provide substance abuse and psychological counseling. Murphy further explained that more effort is required to rehabilitate and deter sex sellers than buyers because many prostitutes have been sexually abused, selling sex since the age of 13 to 14, disassociated from their actions through the use of drugs and alcohol, and/or controlled by a violent pimp or procurer.

The second and last witness to testify on behalf of the State was Metro Lieutenant Terry Davis, a supervisor of the vice department and teacher at the First Offender Program for Men. Officer Davis testified that the program was designed for buyers of sex. Davis also confirmed that he told a Las Vegas newspaper that the impetus of the policy was Metro's need for an underlying solicitation of prostitution conviction in order to revoke an adult entertainment industry employee's work card.

At the end of the hearing, Judge Togliatti reserved her ruling so that the seven justices of the peace in Las Vegas Justice Court, who were not present at the evidentiary hearing, could take the matter under advisement and reach a collective decision. On December 27, 2000, Judge Togliatti issued a lengthy order stating that the Las Vegas Justice Court had unanimously found that the policy did not discriminate on the basis of gender and that its distinction based on buyers of sex and sellers of sex was constitutionally permissible. In so finding, Judge Togliatti qualified this conclusion by stating that the judges were relying on the district attorney's representations that his policy applied to all sellers of sex regardless of gender, and consequently ordered Mr. Bell to clarify this fact in writing to his deputies within ten days.

In response to the court's order, Mr. Bell filed a clarification of policy in the justice court, affirming that he had distributed a memo clarifying that the First Offender Program for Men was available only to buyers of sex regardless of whether they were male or female. Accordingly, under the clarified policy, if a female buyer of sex was charged with solicitation of prostitution, she, like a male buyer of sex, would have the option of attending the First Offender Program, thereby avoiding a solicitation conviction.

Salaiscooper appealed the justice court ruling to the district court, which concluded that the decision of the justice court was supported by substantial evidence, and that the policy of the Clark County District Attorney's Office was constitutional.[2] Consequently, the district court remanded the Salaiscooper case back to the Las Vegas Justice Court for trial. Thereafter, the district court stayed the justice court proceedings until this court addressed the issue by way of extraordinary writ. Salaiscooper

[2]NRS 177.015(1)(a) permits an appeal to the district court only from a *final judgment* of the justice court. Here, petitioner appealed to the district court from an interlocutory order of the justice court, and there is no statutory provision or court rule permitting such an appeal. Thus, the district court lacked jurisdiction to consider the "appeal." Petitioner should have sought, and certainly would have obtained, the district court's review of the order by way of a petition for a writ of certiorari. This court could have then properly reviewed the district court's ruling in an appeal authorized by statute. *See* NRS 34.120 (authorizing an appeal to this court from an order of the district court resolving a petition for a writ of certiorari). Although the district court lacked jurisdiction to consider the interlocutory "appeal," we conclude that the district court clearly had jurisdiction to exercise its discretion to treat the matter before it as a petition for a writ of certiorari. *See, e.g., In re Temporary Custody of Five Minors,* 105 Nev. 441, 777 P.2d 901 (1989). In light of the far reaching consequences of the issues presented, we are confident the district court would have exercised that discretion for the same reasons we have exercised our discretion to review the instant original petition.

then filed the instant petition for a writ of certiorari, or in the alternative, a writ of prohibition or mandamus, contending that both the justice court and the district court erred in concluding that the no-plea policy's distinction based on buyers and sellers of sex was constitutionally permissible. We discuss the issues raised in the petition below.

## DISCUSSION

We begin by addressing the unusual procedural posture of the controversy before us. The justice court decision at issue in this case, although signed by the justice of the peace who presided over the hearing, apparently resulted from the collaborative deliberation of all seven judges of the Las Vegas Justice Court. Indeed, at the conclusion of the evidentiary hearing on the constitutionality of the policy, Chief Judge Togliatti stated:

> I'm ordering a copy of the transcript . . . . I will take it under advisement for the seven of us to review the transcript, and we will issue and prepare a written record and decision. I can't give you a definite time frame because we are dealing with seven of us.

Apparently, because this identical issue arose in cases pending in all seven departments, the judges of the Las Vegas Justice Court thought it more efficient and cohesive to reach a collaborative decision in a single "test" case, rather than reassign all cases raising this issue to a single department or decide the issue individually. Although well-intentioned, we cannot approve of such a practice because it is not authorized by the legislature.

The justice courts are courts of limited jurisdiction, and the jurisdictional boundaries of Nevada's justice courts are defined by the legislature.[3] The legislature has vested the justice courts with original jurisdiction in criminal misdemeanor cases.[4] The legislature, however, has not vested the justice courts with the jurisdiction or authority to sit "en banc" or to make collaborative findings. Where a tribunal has no jurisdiction, it is well-recognized that jurisdictional limits cannot be expanded by a stipulation amongst the parties.[5]

In the instant case, the justice court exceeded its authority in its

[3]Nev. Const. art. 6, § 8.
[4]NRS 4.370(3).
[5]*State of Nevada v. Justice Court,* 112 Nev. 803, 919 P.2d 401 (1996).

procedural treatment of this matter to the extent that it collaborated with other judges of the Las Vegas Justice Court to reach a collective decision. Although it is perfectly appropriate for judicial colleagues to discuss legal issues in the context of hypothetical situations, there is no statute or court rule authorizing a collective decision of an existing controversy before a justice court or district court.[6]

Although the technical procedure implemented to review this matter was improper, we conclude that the justice court properly exercised jurisdiction over the substantive equal protection issue because it arose in the context of a criminal misdemeanor case. The legislature has necessarily empowered justice courts with authority to resolve constitutional issues arising in criminal misdemeanor cases.[7] For example, the justice courts are often called upon to resolve constitutional issues in ruling on motions to suppress evidence[8] or in ruling upon the constitutionality of prior convictions where a defendant is charged with a second misdemeanor violation of driving under the influence.[9]

This court has previously discussed the municipal courts' authority to rule on constitutional issues in the cases of *In Re Dixon,*[10] and *McKay v. City of Las Vegas.*[11] In *Dixon,* this court was concerned with a municipal court ruling upholding the constitutionality of an ordinance imposing a licensing tax.[12] Similarly, in *McKay,* this court was concerned with municipal court and district court decisions holding that a state statute imposing a court assessment fee was unconstitutional.[13] Our decisions in both *Dixon* and *McKay* correctly held that a municipal court has no jurisdiction to consider the constitutionality of legislation imposing a tax or an assessment. Neither case, however, should be read for the proposition that municipal or justice courts have no authority whatever to consider issues of constitutional dimension. The justice courts have express authority to consider constitutional

---

[6]*See generally* NCJC Canon 2.

[7]Nev. Const. art. 6, § 8; NRS 4.370(3).

[8]NRS 189.120; *State v. Shade,* 110 Nev. 57, 867 P.2d 393 (1994).

[9]*See Parsons v. State,* 116 Nev. 928, 937, n.8, 10 P.3d 836, 841-42 n.8 (2000).

[10]40 Nev. 228, 161 P. 737 (1916) (holding that a municipal court, had no constitutional or statutory authority to rule on the legality and constitutionality of a tax imposed on attorneys practicing within the city limits).

[11]106 Nev. 203, 789 P.2d 584 (1990) (holding that municipal courts have no power to declare a tax statute unconstitutional).

[12]40 Nev. at 239, 161 P. at 740.

[13]106 Nev. at 204-05, 789 P.2d at 585.

issues, including claims concerning the constitutionality of searches, admissibility of evidence, the validity of prior convictions, and as in this case, issues involving selective, discriminatory, gender-based prosecution. To the extent that our decisions in *Dixon* and *McKay* might be read to support a holding to the contrary—that a justice court has no power to rule on *any* constitutional question posited in a criminal misdemeanor case—they are hereby overruled.

Having concluded that the justice court had jurisdiction to entertain the question of the constitutionality of the policy, we turn to the substance of the petition. Salaiscooper seeks an extraordinary writ "directing the Honorable Judge Joseph T. Bonaventure to in turn direct the Clark County District Attorney's Office to cease and desist exercising a discriminatory policy." Salaiscooper contends that extraordinary relief is warranted because she has no adequate remedy at law to appeal the district court's decision regarding the constitutionality of the policy.

Salaiscooper seeks one of three extraordinary writs. First, a writ of certiorari is available where "an inferior tribunal, board or officer, exercising judicial functions, has exceeded the jurisdiction of such tribunal, board or officer and there is no appeal, nor, in the judgment of the court, any plain, speedy and adequate remedy" at law.[14] Second, a writ of mandamus is available to compel the performance of an act which the law requires as a duty resulting from an office, trust or station or to control an arbitrary or capricious exercise of discretion.[15] Third, a writ of prohibition is available to arrest the proceedings of a district court exercising its judicial functions, when such proceedings are in excess of the jurisdiction of the district court.[16]

Petitions for extraordinary relief are addressed to the sound discretion of this court.[17] Generally, we will not consider a writ petition if a petitioner has a plain, speedy and adequate remedy in the ordinary course of law.[18] However, this court has, in rare instances, selectively exercised its constitutional prerogative to entertain a petition despite the fact that there was an adequate, alternative remedy at law.[19] For example, this court held that

[14]NRS 34.020(2).

[15]NRS 34.160; *Round Hill Gen. Imp. Dist. v. Newman,* 97 Nev. 601, 637 P.2d 534 (1981).

[16]NRS 34.320.

[17]*State ex rel. Dep't Transp. v. Thompson,* 99 Nev. 358, 662 P.2d 1338 (1983).

[18]NRS 34.170.

[19]*See, e.g., State of Nevada v. Dist. Ct.,* 116 Nev. 127, 994 P.2d 692 (2000); *Jeep Corp. v. District Court,* 98 Nev. 440, 652 P.2d 1183 (1982).

extraordinary relief was warranted in a matter of statewide importance,[20] in a matter where "sound judicial economy and administration militated in favor of such petitions,"[21] and in a matter where there was a "gross miscarriage of justice."[22]

In the instant case, although there is no underlying conviction, the policy of judicial economy supports our decision to consider the merits of this petition. There are fifty-six similar cases pending in the justice courts, which without intervention would require fifty-six separate trials and subsequent appeals that may be potentially affected by this court's decision. Further, Salaiscooper's petition presents an issue of great statewide significance; namely, whether the district attorney engaged in impermissible and unconstitutional selective prosecution that violates her right to equal protection under the law. Although we address the merits of this case, we emphasize that generally, and except in extraordinary circumstances warranting interlocutory intervention, we will not consider the legal issues presented in a criminal case prior to entry of the judgment of conviction. Our decision to do so here is expressly limited to the unique facts, peculiar procedural history, and far-reaching questions presented in this case.

Salaiscooper argues that, in enacting the policy, the district attorney engaged in impermissible and unconstitutional selective prosecution that violated her right to equal protection under the law. Specifically, Salaiscooper argues that the policy's distinction between buyers and sellers of sex is "nothing more than a facade" concealing "conscious, intentional discrimination" against women, and thereby violates the Equal Protection Clauses of the United States and Nevada Constitutions.[23] We conclude that Salaiscooper's argument lacks merit.

"The government's decision to deny an arrestee admission into a diversion program is a decision to prosecute and [on review is treated] as a claim of selective prosecution."[24] A defendant alleging unconstitutional selective prosecution has an onerous burden. Indeed, a district attorney is vested with immense discretion in deciding whether to prosecute a particular defendant that "neces-

[20]*Id.*

[21]*Smith v. District Court,* 113 Nev. 1343, 1344, 950 P.2d 280, 281 (1997).

[22]*State v. Babayan,* 106 Nev. 155, 176, 787 P.2d 805, 819 (1990).

[23]*See* U.S. Const. amend. XIV, § 1; Nev. Const. art. 4, § 21.

[24]*Fedorov v. U.S.,* 600 A.2d 370, 377 (D.C. 1991).

sarily involves a degree of selectivity."[25] In exercising this discretion, the district attorney is clothed with the presumption that he acted in good faith and properly discharged his duty to enforce the laws.[26] Although the district attorney's prosecutorial discretion is broad, it is not without limitation.[27] The Equal Protection Clause constrains the district attorney from basing a decision to prosecute upon an unjustifiable classification, such as race, religion or gender.[28]

The requisite analysis for a claim of unconstitutional selective prosecution is two-fold. First, the defendant has the burden to prove a prima facie case of discriminatory prosecution.[29] To establish a prima facie case, the defendant must show that a public officer enforced a law or policy in a manner that had a discriminatory effect, and that such enforcement was motivated by a discriminatory purpose.[30] A discriminatory effect is proven where a defendant shows that other persons similarly situated "are generally not prosecuted for the same conduct."[31] A discriminatory purpose or "evil eye" is established where a defendant shows that a public administrator chose a particular course of action, at least in part, because of its adverse effects upon a particular group.[32] If a defendant proves a prima facie case, the burden then shifts to the State to establish that there was a reasonable basis to justify the unequal classification.[33] Where the classification is based on gender, the court applies an intermediate standard of scrutiny; in other words, the court must conclude the unequal classification in the policy is " 'reasonable, not arbitrary, and [rests] upon some

[25]*State v. Barman,* 515 N.W.2d 493, 497 (Wis. Ct. App. 1994); *see also U.S. v. Armstrong,* 517 U.S. 456, 464 (1996) (" 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion' " (quoting *Bordenkircher v. Hayes,* 434 U.S. 357, 364 (1978))).

[26]*People v. Nelson,* 427 N.Y.S.2d 194, 198 (Crim. Ct. 1980).

[27]*Federov,* 600 A.2d at 376.

[28]*See id.*

[29]*Yick Wo v. Hopkins,* 118 U.S. 356, 373-74 (1886) (holding that laws that are administered with an "unequal hand" and an "evil eye" are unconstitutional); *see also Armstrong,* 517 U.S. at 464-65.

[30]*See Armstrong,* 517 U.S. at 464-65.

[31]*U.S. v. Aguilar,* 883 F.2d 662, 706 (9th Cir. 1989) (citing *U.S. v. Wilson,* 639 F.2d 500, 503 (9th Cir. 1981)).

[32]*Wayte v. U.S.,* 470 U.S. 598, 610 (1985); *State v. McCollum,* 464 N.W.2d 44 (Wis. Ct. App. 1990); *Armstrong,* 517 U.S. at 465.

[33]*Minneapolis v. Buschette,* 240 N.W.2d 500, 505 (Minn. 1976).

ground of difference having a fair and substantial relation to the object of the legislation.' ''[34]

In the instant case, the justice court found that the district attorney had a valid, gender-neutral motivation for creating the policy classification—to draw a distinction between buyers and sellers of sex in order to deter acts of prostitution. More specifically, the justice court found that it was reasonable for the district attorney to prohibit sellers of sex from attending the one-day diversion program because it would have no deterrent effect. The justice court opined that the classification was therefore necessary because buyers of sex should not be precluded from participating in a successful diversion program merely because such treatment would be ineffective in rehabilitating the sellers. Finally, the justice court found that there was ''nothing sinister'' about the district attorney's primary goal of obtaining solicitation of prostitution convictions against sellers of sex so that he could revoke their work cards and, ultimately, stop prostitutes from working in the adult entertainment industry.

The lower court's findings with respect to the district attorney's motivation and intent underlying the policy are findings of fact to be given deference, and they should not be reversed if supported by substantial evidence.[35] The district court correctly concluded that there is substantial evidence in support of the justice court's factual findings. In particular, Dr. Murphy testified that the diversion class would not be an effective deterrent for sex sellers because they would need a one-year rehabilitation program in light of the deeply-entrenched culture of drug abuse, psychological abuse, and violence associated with prostitution. Moreover, Officer Davis testified that the district attorney needed solicitation convictions against sellers of sex so that Metro could revoke their work cards and eradicate prostitution from the strip clubs. Because the State presented evidence that the purpose of the policy's buyer/seller distinction was to deter acts of prostitution, the justice court's findings that the policy did not run afoul of the Equal Protection Clause is supported by substantial evidence.

Other jurisdictions have reached an analogous conclusion, holding that it is constitutionally permissible to treat prostitutes differently than the customers who patronize them.[36] In *People v. Superior Court of Alameda County,* the Supreme Court of California, sitting en banc, held that it was permissible for law

---

[34]*Id.* (quoting *Reed v. Reed,* 404 U.S. 71, 76 (1971)).

[35]*People v. Superior Court of Alameda County,* 562 P.2d 1315, 1320 (Cal. 1977).

[36]*See id.; Buschette,* 240 N.W.2d at 505.

enforcement officials to target sellers of sex, because the "sexually unbiased policy of concentrating its enforcement effort on the 'profiteer'" was not initiated by an intent to discriminate.[37] The court reasoned that the policy was created because of the belief that focusing criminal prosecution on the sellers of sex had the most deterrent effect: "Prostitutes, the municipal court found, average five customers per night; the average customer does not patronize prostitutes five times a year. Because of an effective grapevine, arrest of one prostitute by an undercover officer will deter others, at least for a time."[38]

Like the law enforcement officials in *Alameda,* the law enforcement officials in Clark County believed that targeting sex sellers would deter future acts of prostitution. The State presented evidence in support of its belief that a one-day class would not stop a prostitute from selling sex. Salaiscooper, however, argues that the policy is unconstitutional as a matter of law because the legislature did not intend for Nevada's district attorneys to draw a distinction between sellers of sex and buyers of sex.[39] Salaiscooper argues that the legislature's intent can be gleaned from the fact that the 1999 Nevada Legislature rejected Assembly Bill 230, a bill that was proposed by Metro.

A.B. 230, if enacted, would have prohibited any Nevada district attorney from dismissing a charge for solicitation of prostitution (or negotiating the charge down to a lesser offense) where the charge was supported by probable cause.[40] A.B. 230 further pro-

---

[37] 562 P.2d at 1320. Sellers of sex were "targeted": (1) by utilizing male police officer "decoys"; (2) where no decoy was used, by arresting only the prostitute and letting the buyer go free; and (3) even in instances where both were arrested, the prostitute would be subject to custodial arrest and quarantine, where the male customer would be released on his own recognizance. *Id.* at 1321-23.

[38] *Id.* at 1321. This identical reasoning was also set forth in *Buschette,* 240 N.W.2d at 505, which held that it was permissible for the police to arrest prostitutes, and not their customers, because "the arrest of one seller will prevent more occurrences of the behavior proscribed by the ordinance in question than the arrest of a number of buyers." In so holding, the *Buschette* court emphasized that: " '[p]lainly, it is outside the province of a trial court to direct a police department, whose manpower is already severely strained in coping with the increase in such major felonies as murder, robbery, rape, and other assaults, how best to utilize its personnel in the enforcement of a relatively minor misdemeanor statute.' " *Id.* at 505-06 (quoting *U.S. v. Wilson,* 342 A.2d 27, 32-33 (D.C. App. 1975) (Reilly, C. J., concurring)).

[39] We recognize that our legislature, in criminalizing prostitution, has not drawn a distinction between buyers and sellers of sex. NRS 201.354 provides that "[i]t is unlawful for any person to engage in prostitution or solicitation therefor, except in a licensed house of prostitution." NRS 201.295(4) defines prostitution as "engaging in sexual conduct for a fee."

[40] A.B. 230, 70th Leg. (Nev. 1999).

vided that an adult entertainer's work license would be revoked following a solicitation conviction.[41] The recital of A.B. 230 referenced the "increasing problem with [adult] entertainers engaging in the crime of engagement in or solicitation of prostitution" and provided that "it is necessary for the State of Nevada to exercise its police powers to prevent such crimes."[42]

Despite Salaiscooper's contention, we conclude that the legislature's failure to pass A.B. 230 does not reflect upon the legislature's intent because it never affirmatively considered A.B. 230. In fact, Metro formally withdrew the legislation from consideration, explaining that the First Amendment issues presented in the bill needed to be "carefully and deliberately crafted" and that "[i]n light of recent legal challenges and case law development, [Metro] believed that it was not timely to act on A.B. 230."[43] Because the committee minutes clearly indicate that the substance of A.B. 230 was never considered, we conclude that Salaiscooper's contention lacks merit.

## CONCLUSION

In light of our conclusion that the policy does not violate the Equal Protection Clauses of the United States and Nevada Constitutions, we conclude that extraordinary relief is not warranted in this matter. The legislature has vested the district attorney with prosecutorial discretion, and we conclude it is within the purview of the district attorney's prosecution powers to treat buyers of sex differently than sellers of sex. After all, the decision to prosecute, including the offer of a plea bargain, is a complex decision involving multiple considerations, including prior criminal history, the gravity of the offense, the need to punish, the possibility of rehabilitation, and the goal to deter future crime. Unless a defendant can prove that a district attorney's decision to prosecute arose from an impermissible desire to discriminate on the basis of race, gender or other protected class, our federal and state constitutions do not compel our intervention. Because there is no evidence of a discriminatory motive in the case before us, we deny Salaiscooper's petition.

---

[41]*Id.*

[42]*Id.*

[43]Hearing on A.B. 230 Before the Assembly Comm. on Judiciary, 70th Leg. (Nev., March 1, 1999).