THE STATE OF NEVADA, Appellant, v.
RUBEN BABAYAN, Respondent.

No. 18713

GREG SARKISSIAN, Petitioner, v. THE SECOND JUDI-
CIAL DISTRICT COURT OF THE STATE OF
NEVADA, and the HONORABLE ROBERT L.
SCHOUWEILER, DISTRICT JUDGE, Respondents,
and THE STATE OF NEVADA, Real Party in Inter-
est.

No. 18732

March 1, 1990                                          787 P.2d 805

*Brian McKay,* Attorney General, Carson City; *Mills Lane,*
District Attorney, and *John W. Helzer,* Deputy District Attorney,
Washoe County, for Appellant and Respondent Second Judicial
District Court.

*Dean R. Heidrich,* Reno; *Pinkerton & Polaha,* Reno; *Mark
Mausert,* Reno, for Respondent Babayan and Petitioner.

## OPINION

*Per Curiam:*

This opinion considers two consolidated matters which arose from a series of five grand jury indictments. The indictments, returned between May 9th and December 13th, 1984, charged respondent Ruben Babayan (Babayan) and his co-defendants, petitioner Greg Sarkissian (Sarkissian) and Manouchehr Rashidi (Rashidi), with multiple counts of child abuse causing substantial mental harm, sexual assault, and lewdness with a child under the age of fourteen. *See* NRS 200.508; NRS 200.366; NRS 201.230. Prior to trial, Babayan and Sarkissian moved to dismiss the indictments. They contended, *inter alia,* that the indictments were invalid because (1) the district attorney had failed to present exculpatory evidence to the grand jury; and (2) those involved in the investigation and presentation of evidence to the grand jury had such conflicts of interest that concepts of due process and fundamental fairness were violated. The district court granted the motion with respect to respondent Babayan and dismissed with prejudice all indictments against him; however, the district court perceived a difference in the level of misconduct involving petitioner Sarkissian and denied his motion.

The State now appeals from that portion of the district court's order that dismissed all indictments against respondent Babayan

with prejudice. Petitioner Sarkissian seeks mandamus directing respondents, the Second Judicial District Court of the State of Nevada and the Honorable Robert L. Schouweiler, District Judge, to dismiss the indictments against him. For the reasons set forth below, we (1) affirm that portion of the district court's order dismissing the indictments against Babayan, (2) reverse the district court's decision to dismiss the indictments with prejudice, and (3) grant the relief petitioner Sarkissian seeks.

## FACTS

The allegations that formed the basis of the grand jury indictments against Babayan and Sarkissian began to surface in early March, 1984, following the psychological evaluation of a child who attended the Montessori preschool on Hash Lane in Reno.[1] Following a brief interview of the child at the Children's Behavioral Clinic in Reno, the evaluator, a contract psychologist at the clinic and a clinical psychology student at the University of Nevada, Reno, concluded that the child had been sexually abused.

Washoe County Sheriff's Detectives soon began to investigate the alleged child abuse by interviewing children who attended Babayan's preschools, the children's parents, and preschool teachers and staff. As word of the alleged abuse and the investigation spread, more parents began to have their children who attended the preschools evaluated. Most of the evaluations were conducted by employees of the Children's Behavioral Clinic or by clinicians with whom the Children's Behavioral Clinic employees were associated in private practice. In time, more alleged victims began to surface. The allegations of child abuse, originally made against only Sarkissian—a shuttle bus driver and handy man at the Hash Lane preschool—soon included respondent Babayan and petitioner Sarkissian's successor in employment, Manouchehr Rashidi. Ultimately, a task force was formed to carry on the burgeoning investigation and to collate the information being gathered.

By at least mid-April, 1984, private civil attorneys contemplating civil suits against the preschools began contacting the District Attorney's Office. John Maher, the Assistant District Attorney that Washoe County District Attorney Mills Lane originally assigned to the case, later described the interaction between the District Attorney's Office and civil attorneys, and, in particular, attorney Peter Chase Neumann, as a bi-directional flow of statements made by the civil attorneys' clients. At least one civil

---

[1]The Montessori preschool on Hash Lane was one of two preschools owned and operated by respondent Babayan in Reno.

attorney contacted the District Attorney's Office and expressed concern regarding the speed at which the investigation of the case was progressing.

In early May, 1984, the District Attorney's Office also became aware of other complaints about the slowness of the investigation. District Attorney Mills Lane in a subsequent hearing attributed these complaints to parents and other people that were involved with the school. A meeting was held on May 3, 1984, at the Washoe County District Attorney's Office in order to address the concerns. In attendance at the meeting were therapists who had evaluated some of the alleged victims, parents—at least one of whom, Dr. William Terry, was also a therapist actively engaged in evaluating alleged victims and providing information for the investigation—and supporters of respondent Babayan. Also in attendance were Mills Lane, John Maher, John Oakes—who later, for a time, would prosecute the case—and sheriff's deputies. On that night, while the investigation of the alleged abuse and the psychological evaluations of children were still ongoing, the decision to go forward with the prosecution was made.

The District Attorney's Office filed a complaint on May 4, 1984, and made its first presentation to the grand jury on May 9, 1984. It made subsequent presentations to the grand jury on June 6, September 13, October 25, and December 12, 1984. Those testifying at the grand jury presentations included: Washoe County Sheriff's Detective Brent Royle, civil attorney Peter Chase Neumann,[2] some alleged victims, the alleged victims' parents, and various therapists who had evaluated and/or were treating the children. In all, the grand jury returned five indictments against Babayan, Sarkissian, and Rashidi that alleged sixty-nine counts of child sexual abuse involving twenty-six alleged victims.

In mid-1985, the various counsel for the defendants joined in a motion to have the alleged victims examined by independent experts. The Honorable Robert Schouweiler held a hearing on the motion on July 9, 1985. There, Rashidi's counsel stressed the need for evaluation of the children by outside experts, rather than, as he phrased it, "marriage and family counselors and therapists whose children had attended the Montessori School." The purpose of the psychiatric evaluation that the defendants proposed was not to determine the specifics of the State's allegations, but to evaluate the alleged victims' credibility and competency. As a factual basis for the motion, counsel pointed to statements by children that were either inconsistent with estab-

---

[2]As will be discussed more fully below, Neumann testified at the first grand jury proceedings regarding the admissibility of certain hearsay statements.

lished facts, *i.e.*, one child alleged total penile penetration of her vagina when a medical examination revealed that her hymenal ring was intact, or that were simply incredible, *i.e.*, another child alleged that large bullets had been fired into his rectum and that he had been forced to kill hundreds of people.

Defendants' counsel offered as an expert witness Dr. Robert ten Bensel, a nationally recognized pediatrician and expert in child abuse. Dr. ten Bensel testified about the necessity of having evaluators skilled in developmental psychology, the effect of leading and coercive questions on children, the anatomy of small children, and the physical trauma that would be evident if full vaginal or anal penetration had occurred as alleged. Defendants' counsel also offered the testimony of Dr. Ernest A. Dernburg, a child psychiatrist, who was highly critical of the techniques that the clinicians employed in their evaluations of the children.

Even before Judge Schouweiler granted the defendants' motion for psychiatric evaluation of the children on July 22, 1985, the defendants, on July 12, 1985, moved to disqualify the District Attorney's Office from prosecuting the charges against them. Among other things, the defendants alleged that the District Attorney's Office was under the influence and control of private civil attorneys and, therefore, was unable to prosecute the action fairly. In addition, the defendants alleged that the District Attorney's Office had failed to present exculpatory evidence in its presentations to the grand jury. Presumably because the defendants also alleged in their motion that District Attorney Mills Lane had surreptitiously entered Judge Schouweiler's chambers without permission, the Honorable Jerry Carr Whitehead heard the defendants' motion. After a two-day hearing, Judge Whitehead denied the defendants' motion in its entirety. To set the holding on whether the District Attorney's Office was under the control of civil attorneys, Judge Whitehead stated:

> So as to make the holding of this day clear, the Court finds not only that the defendants failed to meet their burden of proof, but that in addition, the facts brought forth at the hearing established that the District Attorney's Office in exercising its prosecutorial function, did so independent of outside influence.

Judge Whitehead declined to make a determination regarding the defendants' allegation that the District Attorney's Office failed to present exculpatory evidence to the grand jury because he believed that a complete examination of all the evidence would be necessary. Judge Whitehead, however, stated in his written order,

> The court, however, can and does determine that based upon the testimony presented, that the four pieces of evidence

introduced by the defendants, standing alone, do not require a finding by this Court that acts of sexual assault charged in the four counts could not have occurred. This is true as only the slightest penetration is necessary to complete the offense charged and it may not leave permanent physical evidence. In addition, there are other sexual offenses which would not leave permanent physical evidence.

After Judge Schouweiler entered his order granting the defendants' motion for a psychiatric examination of the children, the State, in effect, appealed to this court by way of a petition for a writ of mandamus. Following an informal hearing, the parties agreed to an evaluation of the children by independent experts. In an order dated September 12, 1985, Judge Schouweiler set out the procedure the evaluation was to follow and appointed a master to coordinate the evaluation process.

In May, 1987, Judge Schouweiler announced in an order that the psychiatric evaluations of the children were substantially complete. The order informed the District Attorney's Office that it had twenty days in which to review the evaluations and to announce whether it intended to proceed with the prosecution of the case. The reports of the independent experts, which contained a data base consisting of a summary of the materials the experts reviewed and their comments thereon, and a summary of the experts' opinion on the issue of witness contamination, were generally critical of the leading questions and coercive techniques employed by the various therapists and clinicians.[3] The experts' conclusions regarding the degree of contamination, however, varied from child to child.

On July 16, 1987, the State moved to dismiss all charges against Manouchehr Rashidi. The district court ultimately granted this motion. In the same motion, the State gave notice of the charges on which it intended to proceed. The charges against respondent Babayan and petitioner Sarkissian involved a total of ten alleged victims; the charges against respondent Babayan were: five counts of child abuse causing substantial mental harm, three counts of lewdness with a child under fourteen, and two

---

[3]Among the various types of contamination errors found by the independent experts were: (1) the interviewers either consciously or unconsciously followed a preconceived agenda, *i.e.*, assumed facts, coerced the child, ignored the child's information, led the child, etc., (2) concertizing, *i.e.*, where as a result of having to repeat the allegations or being exposed to repetitive leading discussions the child's memories of the event come from sources other than the event itself, (3) cross-contamination, *i.e.*, using information gained from a source other than the child to question the child, and (4) systems contamination, *i.e.*, contamination from influences outside the mental health sessions—interactions with police, parents, or the media.

counts of sexual assault; the charges against petitioner Sarkissian were: six counts of lewdness with a child under fourteen, and four counts of sexual assault.

In November, 1987, the independent experts examined all but one of the ten alleged victims to determine the children's competency to testify at trial.[4] The experts believed that six of the children were competent to testify, two were not competent to testify and one child's competency was questionable.

In late October, 1987, before the experts conducted their competency evaluations of the children, respondent Babayan and petitioner Sarkissian filed what they entitled their "First Motion to Dismiss." The basis of the motion was the District Attorney's failure to present exculpatory evidence to the grand jury. In addition, Babayan and Sarkissian alleged that those involved in the investigation and presentation of evidence to the grand jury had such conflicts of interest that concepts of due process and fundamental fairness were violated.

Among the evidence that Babayan and Sarkissian considered exculpatory and, according to them, that the District Attorney failed to present to the grand jury was: (1) the denials by the Montessori Schools' teachers and staff that any sexual abuse of children had occurred, (2) the children's implicating numerous other people as alleged molesters (presumably, the presentation of this information would have cast grave doubts on the children's credibility), (3) the failure of numerous physical examinations to disclose any evidence of sexual abuse, (4) the children's allegations that all three defendants, together, had molested them when Rashidi and Sarkissian had not worked at the schools during the same periods, (5) the likelihood that the children had acquired sexual knowledge from other sources, such as their parents—one child's father managed an adult book store and maintained a pornography collection at home—or through past episodes of abuse—the defendants pointed to one child who had previously been abused by persons unassociated with the Montessori school and another child's mother who was known to have engaged in "inappropriate behavior" that included "pulling and kissing [the child's] penis when putting the child to bed." In addition, the defendants pointed to what they termed "miscellaneous Exculpatory Evidence," which included: (1) information received from parents of children who were not alleged victims that nothing untoward had happened at the schools, (2) the floor plans of the schools, which, according to the defendants, would have demonstrated that the alleged activities could not have transpired unno-

---

[4]The family of the one child that the independent expert did not examine moved from the Reno area.

ticed, (3) the existence of a private tutorial service that rented space at one of the schools and, presumably, whose employees would have noticed the alleged abuse had it occurred, (4) the leading and coercive techniques employed by the various therapists, of which, again according to the defendants, the District Attorney had notice as early as May 3, 1984, (5) the emotional involvement of two of the therapists, by reason of their having children who attended the Montessori schools, and (6) the pecuniary interest of the therapists and clinicians who stood to benefit not only from civil suits, but also from continuing to treat the alleged victims.

In enumerating what they alleged as conflicts of interest, the defendants cited, among other things: (1) the involvement in the investigation and presentation to the grand jury of the two local therapists who had children in the schools, (2) Assistant District Attorney John Maher's involvement with an alleged victim's mother and his previous acceptance of a gold belt buckle from civil attorneys to whom he allegedly referred clients in another child sexual abuse case, and (3) the "inappropriate liaison" between the District Attorney's Office and civil attorneys, exemplified by, among other things, District Attorney Mills Lane's improper suggestion to civil attorneys that they contribute to the cost of expert witnesses to be used in the prosecution of the charges.

In opposition to the defendants' motion, the State argued that it had not failed to present exculpatory evidence to the grand jury and that the alleged conflicts of interest did not exist. Moreover, the State contended that pursuant to District Court Rule 18(1) Judge Whitehead's previous ruling on the conflicts of interest question precluded Judge Schouweiler from redetermining that issue.

After a hearing on the defendants' motion, Judge Schouweiler issued the order that is the subject of this appeal and petition. As set forth in the order, Judge Schouweiler found the presence of conflicts of interest that tainted the independence of the District Attorney's Office and compromised its presentations to the grand jury. In addition, the court found that the District Attorney's Office had intentionally presented half truths and intentionally misled the grand jurors, had failed to present exculpatory evidence, and had quashed the grand jurors' independence by stifling their questions and by providing inaccurate legal advice. The court concluded that gross violations of due process and separate violations of other constitutional rights had resulted in the denial of the constitutional right to an indictment by an independent grand jury with respect to respondent Babayan. The court found, however, that the misconduct directed toward peti-

tioner Sarkissian did not "rise to the level of a denial of his constitutional rights or to the level where the court must exercise its supervisory powers." Therefore, the court granted Babayan's motion and dismissed with prejudice all charges against him; however, the court denied the motion with respect to petitioner Sarkissian. This appeal and petition ensued.

## DISCUSSION

### Conflicts of Interest

The State contends that the district court abused its discretion and violated District Court Rule 18(1) when it found the conflicts of interest tainted the independence of the District Attorney's Office and its presentations to the grand jury. Thus, according to the State, the district court erred in dismissing the indictments against respondent Babayan.

As indicated above, Judge Whitehead determined that there were no conflicts of interest between the District Attorney's Office and the private civil bar and that the District Attorney's Office had exercised its prosecutorial function independent of outside influence prior to Judge Schouweiler's finding otherwise. District Court Rule 18(1) provides:

> When any district judge shall have entered upon the trial or hearing of any cause, proceeding or motion, or made any ruling, order or decision therein, no other judge shall do any act or thing in or about such cause, proceeding or motion, unless upon the written request of the judge who shall have first entered upon the trial or hearing of such cause, proceeding or motion.

Judge Whitehead made no such request to Judge Schouweiler. Judge Whitehead's decision regarding the alleged conflicts between the prosecution and the civil bar was the decision in the case and his conclusion that the District Attorney's Office exercised its prosecutorial function independent of outside influence was binding. We conclude, therefore, that Judge Schouweiler violated District Court Rule 18(1) in finding otherwise.

The only fact considered by Judge Schouweiler that related to the alleged conflict of interest between the prosecution and the civil bar, and that was not considered by Judge Whitehead, involved attorney Peter Chase Neumann testifying before the grand jury. From our review of the record it is clear that Mr. Neumann's testimony, which dealt with an issue of law regarding the admissibility of hearsay testimony, added little to the evidence

presented and was not necessary. It was the District Attorney's responsibility, and not Mr. Neumann's, to inform the grand jurors of the relevant law. *See, e.g.*, American Bar Association Standards For Criminal Justice, Standard 3-3.5; Model Code of Professional Responsibility EC 5-10 (1980). If the prosecution believed it necessary to have an attorney testify regarding a legal opinion, numerous other attorneys who did not have a direct pecuniary interest in the proceedings could have been obtained. Nonetheless, having reviewed the totality of the information presented to the grand jury and the minimal assistance that Mr. Neumann's testimony provided, we do not believe that his appearance constituted such a conflict of interest as to require dismissal of any of the indictments returned on the day that he appeared.

The second general area of conflicting interests upon which Judge Schouweiler based his decision to dismiss the indictments against respondent Babayan involved the therapists who evaluated and treated the alleged victims and who testified before the grand jury. Judge Schouweiler observed that two of the therapists had children who attended the Montessori preschools and both therapists believed that their children had been molested. Judge Schouweiler found that the therapists assumed conflicting roles, acting both as investigators and as clinicians, and that both were in close alliance with certain civil attorneys.

The State does not dispute these findings. It contends, however, that the findings do not support Judge Schouweiler's decision to dismiss the indictments. According to the State, only those matters of which the District Attorney's Office has full knowledge and, more importantly, approved should serve as a basis for the district court's order. Moreover, the State argues that Judge Schouweiler's findings again overlook the previous finding of Judge Whitehead that the District Attorney acted independent of outside influences. The State's arguments are without merit.

Treating the State's last contention first, we observe that Judge Whitehead's order addressed only whether the District Attorney's Office was under the influence and control of civil attorneys; Judge Whitehead did not decide whether a conflict of interest existed between the District Attorney's Office and the involved therapists. Next, from our review of the record we are convinced that Judge Schouweiler could have reasonably concluded that the District Attorney's Office had full knowledge of the therapists' conflicting interests. While the prosecution may have had little, if any, say regarding the therapists who the parents chose to evaluate and treat the children, it nonetheless must accept responsibility for presenting those therapists as witnesses before the grand jury.

As we observed in Sheriff v. Frank, 103 Nev. 160, 165, 734 P.2d 1241, 1244 (1987) (quoting United States v. Dionisio, 410 U.S. 1, 16-17 (1973)), "[t]he grand jury's 'mission is to clear the innocent, no less than to bring to trial those who may be guilty.' " By presenting as witnesses therapists with obvious conflicting interests without informing the grand jury of such conflicts, the District Attorney's Office undermined the purpose and function of the grand jury which is to assure "that persons will not be charged with crimes simply because of the zeal, malice, partiality or other prejudice of the prosecutor, the government or private persons." United States v. Gold, 470 F.Supp. 1336, 1346 (N.D.Ill. 1979) (quoting United States v. DiGrazia, 213 F.Supp. 232, 235 (N.D.Ill. 1963)). Although we do not ascribe any form of malice to the actions of the District Attorney's Office, its presenting the involved therapists as witnesses without informing the grand jury of their conflicts, when coupled with other derelictions, supports the district court's dismissal of the indictments.

## Intentional Misleading of Grand Jury

The State next contends that the district court abused its discretion in holding that District Attorney Mills Lane *intentionally* presented half truths and *intentionally* misled the grand jury.[5] The

---

[5]The testimony upon which Judge Schouweiler based his holding included that of Detective Brent Royle who testified at both the first and second grand jury proceedings. The following excerpt, taken from the first grand jury proceeding, is illustrative:

Q  [MILLS LANE]: Mr. Rashidi, how did you come to determine whether or not he was in Reno from 1980 through 1984?

A  [DETECTIVE ROYLE]: As far as Manouchehr Rashidi, we obtained, through our search warrant, an application for employment, and on that application of employment, it shows from 1980 through 1982 he was employed by the SAGA, S-A-G-A Corporation which is the food service corporation up at the University of Nevada, and he was employed as a food server up there.

Q:  Where after that?

A:  After that, from 1982 to 1983, he was employed by the engineering library up at the University of Nevada Reno as a counter helper. He is still employed up there.

Q:  Where after that?

A:  *During the same time he was employed as a counter helper up at the law library—or the engineering library, he was also employed as a maintenance handyman and shuttle bus driver for the Reno Montessori Schools.*

. . . .

Q:  Did you get his [petitioner Sarkissian's] employment application?

A:  Yes, I did.

. . . .

Q:  What did it reflect?

A:  It reflects Greg's name on it with a date being filled out of 9-14-83. It shows his employment in the Glendale area, and this was taken at the

district court found that its conclusion is supported by the testimony of Detective Brent Royle. We will confine our review to this testimony since the other factual basis cited by the district court to support its conclusion of intentional misconduct is not persuasive to us.

The district court found that Detective Royle's testimony was misleading in two respects. First, it presented facts indicating that Rashidi and Sarkissian worked at the schools at the same time. This is not correct because Sarkissian left the school in December 1983, and Rashidi did not commence his work there until January 1984. Such information is important because some of the accusations were that both Rashidi and Sarkissian committed the crimes against the victims at the same time. Although the State concedes that Detective Royle's testimony was the result of "poorly worded" questions, it argues that its intent was to show that Rashidi was in Reno prior to beginning employment at the school, that there was no intent to deceive the grand jury and that the only sworn testimony before the district court was contrary to its findings. Second, the district court found that the facts presented by Detective Royle indicated that Babayan was present during the initial interviews with the children, and this created the impression that he was attempting to intimidate the children and prevent them from disclosing information.

---

time he came up to Reno and started employment with Reno Montessori Schools.

Q: When did he begin employment there?

A: The application is dated 9-14-83, however, through information supplied by Mr. Babayan, he started somewhere around the first part of September.

Q: At least in September of '83, correct?

A: Yes, sir.

(Emphasis supplied.)

Following this, Detective Royle testified about his investigation of the alleged abuse, and respondent Babayan's presence during interviews at the pre-schools.

Q [MILLS LANE]: Did there come a time when you made interview of certain people at the Montessori School, children and staff?

A [DETECTIVE ROYLE]: Yes. During our initial investigation, we did contact staff and children at the school.

Q: During those interviews who was present other than the person being interviewed, person in authority?

A: During those interviews, Mr. Babayan, who is the director-owner of the Montessori Schools of Reno, directed both myself and Sgt. Dickson that he was to be present during all of the examination and questioning of all the children and all of the staff members.

Q: Was he, in fact, present?

A: Yes, he was.

At the second grand jury proceeding, Assistant District Attorney John Maher asked questions that were substantially the same and Detective Royle gave substantially the same answers.

While Royle's testimony did establish that Rashidi was in the Reno area prior to his beginning employment in 1984, it also left the general impression that Sarkissian and he worked at the schools during the same period of time. At the very least, it left the issue unresolved. Rather than framing questions better, more questions should have been asked by the prosecutor to establish when Sarkissian and Rashidi were employed by the schools. The prosecution has the duty to present exculpatory evidence to a grand jury conducting a criminal case and this is discussed later in this opinion. Given the allegations against Sarkissian and Rashidi, their periods of employment were relevant and should have been clearly established before the grand jury.

Royle's testimony also established that Babayan attended the initial questioning of the children at his school. However, to say that the only reasonable inference to be drawn from this fact is that Babayan was trying to influence the children is not correct. At best, this was only one of several inferences that could be drawn. The district court indicated that additional information should have been presented to the jury, such as the fact that Babayan attended only some of the interviews and he did encourage parents to attend their child's questioning. While testimony to establish these facts would have been relevant and helpful in explaining Babayan's presence at the initial questioning of the children, such additional information was merely alleged by Babayan and not established by competent evidence in the record. Further, it was not established that the District Attorney's office was aware of these acts at the time of Royle's grand jury testimony.

Certainly, the misimpressions left with the grand jury may have influenced, to some degree, the district court's decision to dismiss the indictments; however, the district court goes too far in finding that Mills Lane or the District Attorney's office created the misimpressions intentionally. At best, it shows that the questions elicited some relevant facts to the grand jury that should have been more fully developed. But when viewed in context of the entire grand jury proceedings, these facts were secondary and we are concerned only with debating what reasonable inferences can be drawn from them.

After a thorough review of the record, we believe that the evidence before the district court does not support its finding that through "careful wording designed to deceive" District Attorney Mills Lane or his staff intentionally misled the grand jury. Accordingly, we conclude that the district court was in error in so finding.

*Quashing Grand Jury Independence*

In its third assignment of error, the State suggests that the district court's finding that the prosecution quashed the grand jury's independence by stifling grand jurors' questions and by providing inaccurate legal advice cannot support the district court's dismissal of the indictments. Although the State concedes that the better practice would have been to allow answers to many of the grand jurors' inquiries, it contends that the majority of instances in which the grand jurors were denied answers to their questions did not involve the ten alleged victims on whom the State intended to proceed to trial.

If the grand jury is to fulfill its purpose of acting as a bulwark between those sought to be charged with crimes and their accusers, it must be permitted to investigate and act as an informed body throughout the entire course of the proceedings. *See* Sheriff v. Frank, 103 Nev. at 165, 734 P.2d at 1244. At the same time, the grand jury, by statute, "can receive none but legal evidence, and the best evidence in degree, to the exclusion of hearsay or secondary evidence." NRS 172.135. Therefore, if the integrity of an indictment is to be preserved, grand jurors must, when appropriate, be steered away from certain areas of inquiry.

It is incumbent on prosecutors who make presentations before grand juries to be adequately informed of the facts and to have conducted sufficient legal research to enable them to properly inform the grand jury on the law and to assist it in its investigation. *See* United States v. Sousley, 453 F.Supp. 754, 758 n.1 (W.D.Mo. 1978). Here, no less than in *Frank,* the Assistant District Attorney who made the initial presentations to the grand jury impaired its independence to some degree by curtailing relevant questioning.

Several questions asked by the grand jurors were relevant to the crimes charged. After receiving testimony about an alleged victim and her classmate being anally assaulted, a grand juror asked if the classmates were together when assaulted. At another time, an alleged victim's mother was asked if the touching of the child on the bottom and vaginal areas occurred in a private area of the school. At still another time, a grand juror inquired whether a teacher was aware of an alleged assault on one child that occurred at the school. In each instance, the deputy district attorney prevented the witness from answering these relevant inquiries.

Although preventing answers to these questions was not proper, it happened only in the initial grand jury presentations and the matters inquired into were not so critical as to affect the

grand jury proceedings at which they occurred. Further, the restriction of grand jury inquiries was the action of just one deputy district attorney. Subsequent presentations by other prosecutors in this case were made without impairing the grand jury's independence and while adhering to the statutory constraints governing what evidence the grand jury should receive.

Although the restriction on the grand jurors asking several questions in the initial grand jury proceedings was improper, we conclude that the district court was incorrect in finding that such moderate restriction thwarted the grand jury's independence and was so prejudicial as to warrant the dismissal of the indictments returned during these proceedings.

### Exculpatory Evidence

The State also argues that the district court abused its discretion in finding that the prosecution failed to present exculpatory evidence to the grand jury. In the State's view, the evidence available to the district court cannot be interpretated to support its finding. We cannot agree.

Exculpatory evidence has been defined as that evidence "which has a tendency to explain away the charge against the target of the grand jury's investigation." Lane v. District Court, 104 Nev. 427, 463, 760 P.2d 1245, 1269 (1988) (STEFFEN, J., concurring) (citing Frank, 103 Nev. at 160, 734 P.2d at 1244). In Frank, we concluded that a deputy district attorney who failed to submit evidence that had a tendency to explain away the charge against a defendant violated his duty as dictated by the language of NRS 172.145(2). Frank, 103 Nev. at 164-65, 734 P.2d at 1244. Although NRS 172.145(2), which provides that "[i]f the district attorney is aware of any evidence which will explain away the charge, he shall submit it to the grand jury," was not yet enacted at the time of the grand jury presentations here, we believe that the statute was declaratory of and clarified existing law. Cf. Johnson v. Superior Court of San Joaquin County, 124 Cal.Rptr. 32, 539 P.2d 792 (Cal. 1975) (construing California statute identical to NRS 172.145(1) [in force at the time of the indictments here] as requiring prosecutor to present exculpatory evidence to grand jury).

In granting respondent Babayan's motion to dismiss, the district court found that substantial exculpatory evidence was known to the District Attorney's Office, but that the prosecutors failed to present it to the grand jury. We essentially agree and hold that the prosecution's failure to present such evidence adds to an overall foundation supportive of the district court's decision to dismiss the indictments.

The prosecution presented evidence to the grand jury that

numerous children were sexually assaulted, either vaginally or anally. The testimony presented indicated that complete penetration had occurred and, in some instances, occurred more than once. At the time of its presentations, the prosecution possessed reports submitted by physicians who had examined the children. None of the physicians found any indicia of sexual penetration. The prosecution did not present these reports to the grand jury. While not entirely dispositive of whether the children were sexually assaulted, *see* NRS 200.364(2) (defining sexual penetration as any intrusion, however slight), evidence that there were no physical findings of penetration would tend to explain away the charges against the defendants, or, at the very least, would suggest that any sexual abuse that might have occurred did not happen as recounted by some of the alleged victims. The grand jury should have had this information before it in order for it to make an informed determination.

Early on, as a result of the initial police investigation, the prosecution received statements by preschool teachers and staff. These statements indicated that there were normally at least four teachers or assistants supervising the children at each preschool, that the shuttle buses between the preschools usually traveled in tandem, and that the children were not normally out of an adult supervisor's presence. None of the teachers or staff who provided statements indicated that they observed any activity or heard any statements that would suggest that child abuse was or had been occurring. The District Attorney's Office, however, never called any of the teachers or staff, the majority of whom were women and some of whom had children attending the preschools, to testify before the grand jury at any of its proceedings. This evidence was of an exculpatory nature and the district attorney should have presented it.

The prosecutors also failed to present certain other evidence which when considered separately may not have explained away the charges, but when viewed in its totality was exculpatory, *i.e.*, the schools' open floor plans, the irregular flow of persons, including parents, in and out of the schools, and the presence of a tutorial service that rented space at the Hash Lane preschool. When considered against the allegations of continuous and ongoing sexual abuse, some of which was alleged to have occurred in open areas, this evidence would have had a tendency to explain away the charges and it should have been presented.

*Indictments' Dismissal with Prejudice*

Although we conclude from the foregoing that the district court did not abuse its discretion in dismissing the indictments against respondent Babayan, our inquiry is not at an end. We now must determine whether it was an abuse of discretion for the district court to dismiss the indictments with prejudice.

It is generally recognized in the federal system that:

> The extreme sanction of dismissal of an indictment is justified in order to achieve one or both of two objectives: first, to eliminate prejudice to a defendant in a criminal prosecution; second, to "help translate the assurances of the United States Attorneys into consistent performances by their assistants."

United States v. Lawson, 502 F.Supp. 158, 169 (D.Md. 1980) (quoting United States v. Fields, 592 F.2d 638, 647 (2d Cir. 1978) (footnotes omitted)). At the state level, the dismissal of an indictment serves equally well to eliminate prejudice to a defendant and to curb the prosecutorial excesses of a District Attorney or his staff. Nonetheless, and as in the federal court system, a dismissal *with prejudice* at the state level is most appropriate upon a finding of aggravated circumstances and only after a balancing of its deterrent objectives with the interest of society in prosecuting those who violate its laws. *Id.* at 171-73. Clearly, dismissal with prejudice is warranted when the evidence against a defendant is irrevocably tainted or the defendant's case on the merits is prejudiced to the extent "that notions of due process and fundamental fairness would preclude reindictment." *Id.* at 172 (citations omitted).

In dismissing the indictments against respondent Babayan with prejudice, the district court found that the District Attorney's Office was guilty of misconduct that went beyond mere negligence. As we have previously indicated, however, the evidence does not support the district court's findings of intentional misconduct by either District Attorney Mills Lane or his staff. Nor do we believe that the evidence supports the district court's finding of a clear pattern of misconduct by the District Attorney's Office.

The district court also found that the prosecutorial misconduct directed towards respondent Babayan rose to a constitutional level as it violated his right to due process. Although we agree that portions of the prosecution's presentations before the grand jury

were deficient and denied respondent Babayan due process of law, the denial of due process before the grand jury, in and of itself, does not mandate dismissal with prejudice. If it did, then every instance in which a prosecutor failed to present exculpatory evidence or was otherwise deficient in presenting the State's position, would require that indictment to be dismissed with prejudice. Although errors occurred in this case, dismissal without prejudice will remedy the derelictions in the absence of an irremedial evidentiary taint or prejudice to the defendant's case on the merits. *Id.*

Respondent Babayan contends that the clinicians, and hence the State, have irreparably altered the accurate recollections of the children by their coercive techniques and leading questions.[6] We disagree. It was the considered opinion of three nationally recognized child abuse experts, to whose selection both parties agreed, that six of the nine children they evaluated were competent to testify at trial. Thus, sufficient untainted evidence is apparently available to permit the State to proceed anew if it elects to do so. Accordingly, we conclude that the district court's decision to dismiss the indictments with prejudice is neither supported by the evidence or the law and, therefore, that the district court abused its discretion in so holding.

## Sarkissian's Writ of Mandamus

With the foregoing in mind, we next consider petitioner Sarkissian's request for a writ of mandamus directing respondents, The Second Judicial District Court of the State of Nevada and Judge Schouweiler, to dismiss the indictments against him. In his order dismissing the indictment against respondent Babayan, Judge Schouweiler wrote:

> The Court finds a difference in the level of misconduct directed towards Mr. Babayan and Mr. Sarkissian. It finds that the misconduct toward Sarkissian does not rise to the level of a denial of his constitutional rights or to the level where the Court must exercise its supervisory powers.

---

[6]Respondent Babayan also asks, pursuant to NRS 177.045, that we review two district court orders—one by Judge Bowen and the other by Judge Schouweiler—in which the courts held that the parents' testimony regarding statements by the alleged victims were admissible as evidence before the grand juries as exceptions to the hearsay rule. While NRS 177.045 permits us to review, upon appeal, "any decision of the court in an intermediate order or proceeding," counsel for respondent Babayan did not file a cross-appeal. *See* NRS 177.075. Accordingly, we decline to review the previous orders of the district courts regarding the admissibility of the parents' testimony at this time. *Cf.* Martinez v. State, 77 Nev. 184, 360 P.2d 836 (1961).

Judge Schouweiler continued later in his order: "Mr. Lane strongly inferred to jurors that Mr. Babayan hired child molesters, and tried to obstruct the investigation, Sarkissian, on the other hand, was not dealt with unfairly in this regard." The district court's reasoning is faulty: it finds the District Attorney's suggestion that Babayan hired child molesters objectionable, but it does not find equally objectionable the inescapable suggestion that Sarkissian was the child molester who Babayan hired. The very conduct that Judge Schouweiler found to be improper, and which we have concluded cumulatively supports the dismissal of the indictments, *i.e.,* the conflicts of interest and the failure to present exculpatory evidence, touched each of the three defendants equally.

In *Lawson,* 502 F.Supp. 158 (D.Md. 1980), one of Lawson's co-defendants joined in a motion to dismiss the indictments against them on the ground of prosecutorial misconduct. The co-defendant contended that if the court found the misconduct, which concerned only Lawson's illegal activities, to have occurred, he, as well as Lawson, was entitled to relief "because they were indicted by the same grand jury and evidence as to each was not segregated." *Id.* at 161 n.5. After determining that the prosecutor's conduct was "deliberately misleading and calculated to create a false impression on the grand jury," *id.* at 163, the court dismissed the indictments against both defendants without prejudice. *Id.* at 173.

Here, just as in *Lawson,* the same grand jury indicted the three defendants, and the district attorney's office did not segregate evidence. Unlike the situation in *Lawson,* however, the derelictions that occurred here directly impacted each of the three defendants. Although the State argues that the extraordinary remedy of mandamus is not available to petitioner Sarkissian, it nonetheless concedes that "there is no significant reason for treating Ruben Babayan and the Petitioner differently." Insofar as there is no reason to treat petitioner Sarkissian differently than respondent Babayan, we agree with the State. We cannot agree with the State, however, regarding the availability of the writ.

Petitions for extraordinary relief are addressed to the sound discretion of this court. State ex rel. Dep't Transp. v. Thompson, 99 Nev. 358, 362, 662 P.2d 1338, 1340 (1983). In *Thompson,* we stated that "judicial economy and sound judicial administration militate against the utilization of mandamus petitions to review orders denying motions to dismiss. . . ." *Id.* at 362, 662 P.2d at 1340. We indicated, therefore, that we would no longer exercise our power for that purpose. *Id.*

We believe that here the very considerations of sound judicial economy and sound judicial administration which underscored our decision in *Thompson,* militate in favor of granting Sarkissian's petition. Having concluded that there are substantial grounds to support the district court's decision to dismiss the indictments and that there is no principled reason to distinguish between petitioner Sarkissian and respondent Babayan, we believe that to permit petitioner Sarkissian's case to be treated differently than Babayan's could result in a gross miscarriage of justice. The circumstances of this case therefore reveal urgency and strong necessity; thus, extraordinary relief is appropriate. *See* Jeep Corp. v. District Court, 98 Nev. 440, 443, 652 P.2d 1183, 1185 (1982).

## *CONCLUSION*

Having carefully reviewed the record and briefs, and having heard the parties' oral arguments, we conclude that the district court did not abuse its discretion in dismissing the indictments against respondent Babayan. The record supports the district court's conclusion that the prosecutor failed to present clearly exculpatory evidence and that the therapists who gave expert testimony did so with substantial conflicts of interest that was not brought to the grand jurors' attention. However, it was error to dismiss the indictments with prejudice. We further conclude that there being no principled basis upon which to distinguish petitioner Sarkissian from respondent Babayan, Sarkissian's right to have the charges against him dismissed was clear and the district court abused its discretion in denying Sarkissian's motion. Finally, we conclude that owing to unusual and urgent circumstances which reveal a strong necessity, the extraordinary writ of mandamus is appropriate and may be granted.

We are not unmindful that this matter which has already lingered for over five years will, by our decision today, continue unresolved. We are firmly convinced, however, that the interests of society, the children, their parents, as well as the interests of the defendants demand that the case be handled properly.

Accordingly, we affirm the district court's decision to dismiss the indictments, but reverse its dismissal with prejudice. Petitioner Sarkissian's request for a writ of mandamus directing respondents, The Second Judicial District Court of the State of Nevada and the Honorable Robert Schouweiler, to dismiss the indictments against him without prejudice is granted. The State is granted leave to proceed anew if, in its good faith and considered opinion, evidence exists such that it can establish with the requi-

site degree of certainty that any of the defendants committed the crimes alleged.[7]

It is so ordered.

STEFFEN, A. C. J., ROSE, J., ZENOFF, SR. J.[8], FOLEY, D. J.[9] and LEHMAN, D. J.,[10] concur.

---

[7]Of course, nothing contained herein should be construed as expressing any opinion regarding the guilt of the parties or whether the District Attorney's Office should resubmit the matter to another grand jury.

[8]THE HONORABLE E. M. GUNDERSON, then Chief Justice, appointed THE HONORABLE DAVID ZENOFF, Senior Justice, to sit in place of THE HONORABLE CHARLES E. SPRINGER, Justice.

[9]The Honorable Thomas A. Foley, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE JOHN C. MOWBRAY, Justice. Nev. Const. art. VI, § 4.

[10]The Honorable Jack Lehman, Judge of the Eighth Judicial District Court, was designated by the Governor to sit in place of THE HONORABLE CLIFF YOUNG, Chief Justice. Nev. Const. art. VI, § 4.