132 Nev., Advance Opinion 79

# IN THE SUPREME COURT OF THE STATE OF NEVADA

ANTHONY MAYO,
Petitioner,
vs.
THE EIGHTH JUDICIAL DISTRICT
COURT OF THE STATE OF NEVADA,
IN AND FOR THE COUNTY OF
CLARK; AND THE HONORABLE
KATHLEEN E. DELANEY, DISTRICT
JUDGE,
Respondents,
and
THE STATE OF NEVADA,
Real Party in Interest.

No. 69566



FILED

NOV 23 2016

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Original petition for a writ of mandamus directing the district court to grant a pretrial petition for a writ of habeas corpus.

*Petition denied.*

Phillip J. Kohn, Public Defender, and Dan A. Silverstein and Arlene Heshmati, Deputy Public Defenders, Clark County,
for Petitioner.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County,
for Real Party in Interest.

BEFORE PARRAGUIRRE, C.J., HARDESTY and PICKERING, JJ.

*OPINION*

By the Court, PICKERING, J.:

A grand jury indicted petitioner Anthony Mayo for the murder of his wife. Under NRS 172.145(2), the district attorney must provide the grand jury any evidence of which the district attorney is "aware" that "will explain away the charge." Mayo seeks dismissal of his indictment based on the district attorney's failure to present to the grand jury two notes from his deceased wife's hospital chart. The notes' exculpatory potential was not obvious and only emerged when placed in the context of internet research the defense conducted shortly before trial.

NRS 172.145(2) does not require the district attorney to sift through the evidence and conduct research to construct a defense for the accused. The record supports the district court's finding that, although the district attorney had the hospital chart, he was not aware of the notes and their potential exculpatory value when he presented the case to the grand jury. As the district attorney did not violate NRS 172.145(2) by failing to submit known exculpatory evidence to the grand jury, we deny writ relief.

I.

A.

The Clark County grand jury indicted Mayo on charges of murder, battery constituting domestic violence (strangulation), coercion, and dissuading a witness in connection with the death of his wife, Beverly McFarlane. The couple's daughter testified before the grand jury that Mayo strangled and beat Beverly, leaving her dazed and incoherent. Two days later, Beverly remained incoherent, and the daughter called the police. Beverly had a black eye, abrasions on her neck, and the left side of

her face was bruised and swollen. When the responding officer tried to interview Beverly, she could not give her date of birth, identify the day of the week, or name the President.

Beverly was taken by ambulance to the hospital, where she was examined more thoroughly. The examination revealed neck injuries, swelling on the left side of her face and head, and petechial hemorrhages consistent with strangulation. Within 24 hours of her admission to the hospital, Beverly could no longer speak. She was placed on life support and died two weeks later.

Clark County medical examiner Dr. Alane Olson performed Beverly's autopsy. Beverly's brain was removed and sent to Dr. Claudia Greco, a neuropathologist at the University of California, Davis, for examination. Both Dr. Olson and Dr. Greco testified before the grand jury. Dr. Olson testified that she observed substantial swelling of the brain; that although Beverly had "other significant contributing conditions," namely, "occlusion of the left internal carotid artery, hypertension, and diabetes," the cause of death was "brain injuries due to assault"; and that the manner of death was "homicide." Dr. Greco also observed massive swelling and hemorrhages on the left side and underside of the brain. She testified that hypertension predisposed Beverly to hemorrhage but that trauma, not disease, produced the profound brain injuries that caused her death.

B.

Mayo filed a pretrial petition for a writ of habeas corpus, and a later addendum thereto, seeking to dismiss the indictment without prejudice. In the addendum, Mayo complained that the district attorney violated NRS 172.145(2) by failing to submit exculpatory evidence in the

SUPREME COURT
OF
NEVADA

(O) 1947A

State's file to the grand jury. The omitted evidence consisted of two notes in Beverly's hospital records: (1) a physician's order for a cerebral arteriogram that mentioned "strokes, possible Moya Moya"; and (2) a radiology report noting, among other impressions, "[f]indings are suggestive of a slow progressive vasculopathy that can be seen with moyamoya disease [a]lthough the hypertrophied vessels are not well developed." The addendum attached internet research on moyamoya disease, including an article describing it as "a progressive, occlusive disease of the cerebral vasculature with particular involvement of the circle of Willis and the arteries that feed it" that can cause death "from hemorrhage [dependent] on the severity and nature of the hemorrhage." *See* Roy Sucholeiki, MD, *Moyamoya disease*, Medscape, January 7, 2015, http://www.emedicine.medscape.com/article/1180952-overview. Based on this research, the defense urged the district court to consider that moyamoya disease may have caused or contributed to Beverly's death.

The district attorney forwarded the addendum to Dr. Greco. In response, Dr. Greco reexamined Beverly's brain and issued a supplemental neuropathology report. Dr. Greco's supplemental report states: "Occlusive changes in the Circle of Willis are those of atherosclerosis. There is no pathology present that would lead to a diagnosis of moyamoya disease." Later in the report Dr. Greco concludes: "No evidence of moyamoya disease."

Based on Dr. Greco's supplemental report, the State denied that the notes had exculpatory value, much less that the district attorney was "aware" of them or their significance. The deputy district attorney prosecuting the case acknowledged that, several months before presenting the case to the grand jury, he obtained Beverly's medical records by

Supreme Court
OF
Nevada

(O) 1947A

4

subpoena, which included the notes mentioning moyamoya disease. There were several hundred pages of records, which the deputy forwarded copies of to his experts, Dr. Olson and Dr. Greco. Both doctors advised him that Beverly died from blunt force trauma; neither raised moyamoya disease as a possible cause of death. The district court accepted the deputy district attorney's representation that he did not notice the references to moyamoya disease in Beverly's medical records or recognize them as potentially exculpatory until the defense filed its addendum, more than a year after the indictment was returned.

The defense appears to have obtained Beverly's medical records from the district attorney's office before the case went to the grand jury. Like the prosecution, the defense did not initially recognize the notes referencing moyamoya disease as significant. In the letter the defense sent asking the State to submit certain exculpatory evidence to the grand jury, nothing is said about moyamoya disease. As defense counsel acknowledged, moyamoya disease is "very rare" and not something he knew about before reviewing the medical records in preparation for trial and conducting internet research into it.

The district court held two hearings on Mayo's pretrial habeas corpus petition, which it ultimately denied by written order. In its order, the district court held that "the State is only required to present to the Grand Jury exculpatory evidence of which the State is aware . . . at that time." It found that "although the State had possession of documents that contained reference to the possible existence of moya moya disease" when it presented the case to the grand jury, "the State was not aware of the exculpatory value of such evidence." The district court declined to decide whether the evidence was in fact exculpatory: "THE COURT ma[kes] no

SUPREME COURT
OF
NEVADA

(O) 1947A

5

determination that Beverly McFarlane actually had moya moya disease or that Beverly McFarlane succumbed to moya moya disease." Instead, it resolved the case on the basis that

> the State did not purposefully choose to not disclose the possible existence of moya moya disease, but instead the State was simply unaware of the potential of moya moya disease or its exculpatory value. Because the State was unaware of the possible exculpatory value of the reference in the medical records to moya moya disease the State was not required to present such evidence to the Grand Jury.

The district court stayed Mayo's trial pending this court's decision on Mayo's petition for extraordinary writ relief.

## II.

### A.

A writ of mandamus may issue "to compel the performance of an act which the law requires as a duty resulting from an office, trust, or station, or to control an arbitrary or capricious exercise of discretion." *Schuster v. Eighth Judicial Dist. Court*, 123 Nev. 187, 190, 160 P.3d 873, 875 (2007). But mandamus "is an extraordinary remedy," and "whether an application for a writ of mandate will be entertained lies within the discretion of the court." *Kussman v. Eighth Judicial Dist. Court*, 96 Nev. 544, 545, 612 P.2d 679 (1980). Writ relief from pretrial probable cause determinations is disfavored for reasons of judicial economy and sound judicial administration. *Id.* at 546, 612 P.2d at 680. On rare occasion we have, nonetheless, undertaken mandamus review of pretrial habeas corpus determinations that test the scope of the district attorney's obligation under NRS 172.145(2). *See Schuster*, 123 Nev. at 190, 160 P.3d at 875; *Ostman v. Eighth Judicial Dist. Court*, 107 Nev. 563, 565, 816 P.2d

458, 459-60 (1991) (3-2). Mayo's petition presents a substantial legal question: Does the obligation to present exculpatory evidence of which the district attorney is "aware" extend to evidence the district attorney possesses but does not recognize as exculpatory? Although we deny writ relief, this question deserves a definitive answer, so we accept review and resolve the petition by opinion. *See Schuster*, 123 Nev. at 188-89, 160 P.3d at 874.

## B.

The right of an accused to have the prosecutor present exculpatory evidence to the grand jury derives from statute. *Compare United States v. Williams*, 504 U.S. 36, 51-53 (1992) (rejecting the proposition that federal prosecutors have a duty to provide the grand jury with exculpatory evidence as a matter of federal constitutional law or the inherent supervisory authority of the federal court), *with Schuster*, 123 Nev. at 193-94, 160 P.3d at 877 (declining to require the State to instruct a grand jury on the legal significance of exculpatory evidence; quoting *Williams* and noting this court's reluctance "to expand the rights of grand jury targets beyond those explicitly provided by statute or constitutionally required").

We therefore begin with the text of NRS 172.145(2):

> If the district attorney is aware of any evidence which will explain away the charge, the district attorney shall submit it to the grand jury.

By its terms, NRS 172.145(2) requires that the district attorney be "aware" of evidence "which will explain away the charge" before the duty to submit the evidence to the grand jury arises. To be "aware" of something is to "hav[e] knowledge or cognizance" of it. *Aware, Webster's New College Dictionary* (3d ed. 2008). The district attorney is not "aware"

SUPREME COURT
OF
NEVADA

(O) 1947A

7

of evidence "which will explain away the charge" merely by virtue of possessing evidence that later proves exculpatory. Rather, the district attorney or his or her deputy must appreciate the exculpatory value of the evidence to be "aware" of it for purposes of NRS 172.145(2).

Citing *United States v. Agurs*, 427 U.S. 97 (1976), Mayo urges us to presume that, if exculpatory evidence exists in the State's file, the district attorney is "aware" of it for purposes of NRS 172.145(2). *See Agurs*, 427 U.S. at 110 ("If evidence highly probative of innocence is in [the prosecutor's file], he should be presumed to recognize its significance even if he has actually overlooked it."). But *Agurs* addresses a defendant's constitutional right, under *Brady v. Maryland*, 373 U.S. 83 (1963), to have the government disclose to the defense for the defendant's use at trial exculpatory evidence that is material to guilt or innocence. *Agurs*, 427 U.S. at 107. Unlike a trial jury, "the grand jury sits not to determine guilt or innocence, but to assess whether there is adequate basis for bringing a criminal charge." *Williams*, 504 U.S. at 51. Consistent with this system, "neither in this country nor in England has the suspect under investigation by the grand jury ever been thought to have a right to testify or to have exculpatory evidence presented," *id.* at 52, except as "explicitly provided by statute." *Schuster*, 123 Nev. at 194, 160 P.3d at 877; *see* NRS 172.145(2); NRS 172.245(1). *Brady*'s constitutional disclosure obligation, and by extension, the presumption stated in *Agurs*, thus do not apply in the grand jury setting. *See Gordon v. Ponticello*, 110 Nev. 1015, 1020, 879 P.2d 741, 744 (1994) (noting that "this court, in step with the United States Supreme Court, is reluctant to expand the rights of grand jury targets and make them coextensive with those of criminal defendants" at time of trial); 1 Sara Sun Beale et al., *Grand Jury Law and Practice* § 4:17

SUPREME COURT
OF
NEVADA

(O) 1947A

(2d ed. 2015) (observing that "the standards developed for the prosecutor's duty in the adversarial trial context are not well-suited to the traditional procedures of the grand jury").

To import *Agurs* into NRS 172.145(2) as Mayo suggests would be to rewrite the statute, replacing "is aware of" with "has in his file," like this: "If the district attorney ~~is aware of~~ *has in his file* any evidence which will explain away the charge, the district attorney shall submit it to the grand jury." While the Legislature could write such a statute, it has not. Instead, it has limited the obligation to evidence the district attorney is "aware of . . . which will explain away the charge."[1] Tying the obligation to present evidence to the district attorney's awareness of it and its exculpatory value makes practical sense: When a prosecutor presents a case to the grand jury, the case is in its preliminary stages; the object is for the grand jury to determine whether there is probable cause to believe a violation of the criminal laws has occurred, and that the accused committed that violation.

> A grand jury proceeding is an ex parte investigatory proceeding to determine whether there is probable cause to believe a violation of the criminal laws has occurred, not a trial. Requiring the prosecutor to ferret out and present all evidence that could be used at trial to create a

---

[1] The Legislature adopted NRS 172.145(2) in 1985. 1985 Nev. Stat., ch. 134, § 6, at 555. Although an interim committee had proposed a more "extensive provision . . . , laying a burden on the district attorney," Hearing on S.B. 103 Before the Assembly Judiciary Comm., 63d Leg. (Nev., April 18, 1985), NRS 172.145(2) was adopted instead, limiting the obligation to evidence of which the district attorney "is aware."

> reasonable doubt as to the defendant's guilt would be inconsistent with the purpose of the grand jury proceeding and would place significant burdens on the investigation.

*Williams*, 504 U.S. at 69 (Stevens, J., dissenting); *see* 4 Wayne R. LaFave et al., *Criminal Procedure* § 15.7(f) (4th ed. 2015) (noting that, at the time the prosecutor submits a case to the grand jury the prosecutor "ordinarily does not have the advantage of defense motions identifying those items that the defense views as potentially exculpatory" and that it "would impose an intolerable burden on the government to require it to sift through all the evidence to find statements or documents that might be exculpatory") (footnotes and quotations omitted).

Though not required by the federal constitution or as a matter of the federal courts' supervisory authority, *see Williams*, 504 U.S. at 51-53, in a number of states and in the District of Columbia, "there are statutes or judicial decisions that require prosecutors to inform the grand jury of exculpatory evidence in some circumstances," 1 Sara Sun Beale et al., *supra*, § 4:17, as do the ABA Standards for Criminal Justice, § 3-4.6(e) (4th ed. 2015). Notably, while "[s]tate courts recognizing a prosecutorial obligation to present the grand jury known exculpatory evidence have varied in their description of the scope of that obligation, [a]*ll agree that the evidence must be 'known' to the prosecutor*." 4 Wayne R. LaFave et al., *supra*, § 15.7(f) (emphasis added); ABA Standards, *supra*, § 3-4.6(e) ("A prosecutor with personal knowledge of evidence that directly negates the guilt of the subject of the investigation should present or otherwise disclose that evidence to the grand jury."); *see Moran v. Schwarz*, 108 Nev. 200, 202, 826 P.2d 952, 953 (1992) ("NRS 172.145 requires the grand jury to hear, and the district attorney to submit, *known evidence* which will

explain away the charge.") (emphasis added) (dictum). Requiring that the evidence be "known" to the prosecutor—that he or she be "aware" of it, in other words—comports with the investigative and accusatory function of the grand jury, avoids delay, and recognizes the practical difficulties in "[a]scertaining the exculpatory value of evidence at such an early stage of the proceedings." *State v. Hogan*, 676 A.2d 533, 544 (N.J. 1996); *see Frink v. State*, 597 P.2d 154, 166 (Alaska 1979) ("the prosecutor's obligation to present exculpatory evidence to the grand jury does not turn the prosecutor into a defense attorney; the prosecutor does not have to develop evidence for the defendant and present every lead possibly favorable to the defendant"); *Hogan*, 676 A.2d at 544 ("the prosecutor need not construct a case for the accused or search for evidence that would exculpate the accused. Only when the prosecuting attorney has actual knowledge of clearly exculpatory evidence that directly negates guilt must such evidence be presented to the grand jury."); *see also United States v. Gray*, 502 F. Supp. 150, 152 (D.D.C. 1980) (a pre-*Williams* case holding that, while prosecutors may be required to present exculpatory evidence to the grand jury, "prerequisite" to that dismissing an indictment for failure to do so is "awareness by the prosecutors of the exculpatory evidence in question").

Mayo argues that a rule holding the State strictly accountable for the evidence in the district attorney's file is needed to avoid bad faith abuse of the system. We disagree. When a prosecutor has abused NRS 172.145(2) by withholding known exculpatory evidence and engaging in conduct that impairs the function of an independent and informed grand jury, the courts of this state have not stood silently by. *E.g., State v. Babayan*, 106 Nev. 155, 169-70, 787 P.2d 805, 816-17 (1990) (affirming

order dismissing indictment without prejudice where the State failed to present to the grand jury substantial exculpatory evidence that the district court found was known to the district attorney's office). This is not such a case. As the district court found, the district attorney did not know or have reason to know the references in the hospital notes to moyamoya disease had potential exculpatory value. The references to possible moyamoya disease appeared only twice in several hundred pages of hospital notes and, as the defense conceded in district court, the disease is obscure enough that defense counsel did not initially see the references as significant either. On this record, we decline to disturb the district court's finding that no violation of NRS 172.145(2) occurred. If the references to moyamoya disease have significance, Mayo will have the opportunity to establish as much at trial.

We therefore deny writ relief.

_____, J.
Pickering

We concur:

_____, C. J.
Parraguirre

_____, J.
Hardesty